**Kestutis EIDUKONIS**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Appellant.**

No. 88–1506.

United States Court of Appeals, Third Circuit.

Argued Dec. 5, 1988.

Decided May 3, 1989.

Rehearing and Rehearing In Banc Denied May 31, 1989.

---

Saul H. Krenzel (argued), Philadelphia, Pa., for appellant.

Robert G. Bauer (argued), Abraham, Pressman & Bauer, P.C., Philadelphia, Pa., for appellee.

Before SLOVITER and BECKER, Circuit Judges and BARRY, District Judge.[*]

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

In 1986, Congress reaffirmed the integral role that the National Guard and Reserve forces of the United States play in the total force policy of the United States for national defense. *See* Reaffirmation of Recognition of National Guard and Reserve Forces, Pub.L. No. 99–290, § 1(a)(1), 100 Stat. 413 (1986) (reenacting the almost identical 1982 statute, Recognition of National Guard and Reserve Forces, Pub.L. No. 97–252, Title XI, § 1130, 96 Stat. 759 (1982)). Congress stated that, "the citizen-military volunteers who serve the Nation as members of the National Guard and Reserve ... require and deserve the support and cooperation of their civilian employers, in order to be fully ready to respond to national emergencies." Pub.L. No. 99–290, § 1(b), 100 Stat. 413 (1986). Congress called upon the nation's employers and supervisors for their support in maintaining a strong Guard and Reserve force by "granting employees a leave of absence from their jobs to participate in military training without detriment to earned vacation time, promotions, and job benefits." *Id.* at § 1(a)(3).

The specific provisions governing an employee's rights to be absent from work to fulfill military Reserve obligations and the employer's obligations with respect thereto are contained in the Veterans' Reemployment Rights Act, 38 U.S.C. § 2021 *et seq.* (1982 & Supp.1986). On this appeal, we must decide the standard under which an employee's request for leave from work to carry out an active-duty assignment in the Reserve services should be evaluated. This question is one of first impression for this court.

## I.

Kestutis Eidukonis was hired in 1981 as a Production Control Specialist for the Southeastern Pennsylvania Transportation Authority (SEPTA). In 1984, which is the period relevant to this case, there were two other persons in comparable jobs in the department in which Eidukonis worked, all supervised by Ollin Boyd. One of Eidukonis' principal duties was to work on the budget for SEPTA's rail equipment maintenance division.

At the time he was hired, Eidukonis disclosed that he was a member of the United States Army Reserve (Reserve). Eidukonis held the rank of major in that service. As a reservist, Eidukonis had the obligation to attend two weeks of annual training, which he served at Fort Monroe, Virginia. Reservists in Eidukonis' situation must be willing to serve beyond that period but are free to turn down any particular duty offered in the absence of a national emergency without adversely affecting their status in the Reserve as long as they accumulate the 50 "points" a year required to maintain active status in the Reserve.[1]

One week after Eidukonis joined SEPTA, he left for five months of military leave, beginning a pattern of prolonged absences from work for military duty. The district court found that he was on military leave for 153 days in 1981, 144 days in 1982, 88 days in 1983, and 180 days from 1984 through the first two months of 1985.

---

[*] Hon. Maryanne Trump Barry, United States District Court for the District of New Jersey, sitting by designation.

1. Fifteen of these points are awarded automatically, and the other 35 can be obtained by taking part in the two weeks of annual service and correspondence courses or other activities. Points in excess of the 50 required cannot be carried over into a new year, but do increase a reservist's pension benefits.

During this period, SEPTA had no written employment policy limiting employees' rights to take military leave or defining the manner in which requests should be made or the amount of prior notice required. In each instance, Eidukonis informed his supervisor orally that he planned to take military leave and then confirmed the dates he would be absent in writing. Prior to 1984, Eidukonis' requests were routinely granted without objection or criticism of them.

In 1984, Boyd asked all employees in his department to postpone their summer vacations until completion of a planned move of the department to another location. Eidukonis told Boyd he planned to take his two-week annual Reserve training duty that August, and that he would only take two weeks that year. On the last day of the two-week period, which Eidukonis served at Fort Monroe, he called Boyd and asked to take a week of vacation, which Boyd also approved. Before he went on the two-week tour, Eidukonis had received an offer to come to Fort Indiantown Gap, Pennsylvania, for 26 days to work on a computer project involving the design of a program for the weapons firing ranges at that site. On the last day of his vacation, Eidukonis called Boyd and requested and received permission from Boyd for the 26-day leave. Eidukonis was back at work at SEPTA for one day in September before he left again for the 26 days.

The range control program was not finished within the 26-day period, and the Army extended Eidukonis' tour of duty for an additional 140 days, from October 1, 1984 to February 16, 1985, so that he could complete the project. Eidukonis telephoned Boyd the day after the orders were issued, giving SEPTA three days' notice of the extension, and again received Boyd's consent to the extension. Because of the length of that tour of duty, Eidukonis received Army authorization to move his dependents and household goods to his station. Eidukonis testified that he saw the opportunity to save a little money by moving out of his apartment and putting his goods in storage, which the Army paid for.

Boyd believed that he did not have authority to deny Eidukonis' request for military leave. During Eidukonis' last leave, Boyd read an article about a case in Pensacola, Florida, where a reservist's termination from his employment was upheld.[2] Boyd contacted SEPTA's Human Resources Department shortly after he learned of Eidukonis' orders for the 140-day extension and asked what could be done because Boyd was in a "desperate situation" and he needed Eidukonis, who was one-third of his staff, to return. During that tour of duty, SEPTA's Deputy General Manager Wert (who was coincidentally also a major in the Reserves) contacted Eidukonis and, as Eidukonis testified, "accused [him] of abusing SEPTA by taking military leave." App. at 63. Eidukonis knew that Wert also contacted a major in the Adjutant General Corps at Fort Indiantown Gap, expressing concern over Eidukonis' frequent absences from employment due to military tour commitments.

Eidukonis was scheduled to be back at SEPTA following his 140-day leave on Monday, February 18. However, on February 8, 1985 Eidukonis telephoned Boyd and requested an additional 26-day extension of duty for completion of his computer project. He told Boyd he had also arranged for his annual two-week training subsequent to that. Although Eidukonis had mentioned to Boyd the possibility of an additional extension when he visited SEPTA on October 29, he had not told Boyd before February 8 that there was actually any military order that might require him to be in the military beyond February 18. In fact, Eidukonis knew that military orders were issued November 23, 1984, for his two-week annual training tour scheduled to begin March 18, 1985, after the proposed 26-day extension.

According to Eidukonis, on February 8 Boyd orally approved his request for additional leave, and Eidukonis thereupon signified his acceptance of the orders. The district court made no finding of an oral approval. It is undisputed that on February 11, Boyd called Eidukonis and told him his

---

**2.** Boyd had apparently read a report of *Lee v.* *City of Pensacola,* 634 F.2d 886 (5th Cir.1981).

request for an extension was denied. He confirmed that in a letter dated February 11, which informed Eidukonis that if he did not return to work on February 18, the first workday following his scheduled 140–day leave, Eidukonis would place his employment status with SEPTA in jeopardy. *See* P–16.

Eidukonis consulted with an army legal officer after receiving this letter and was told that SEPTA could not terminate his employment if he continued his military service rather than reporting to work as ordered. On the basis of this advice, Eidukonis did not report for work on February 18, but instead remained at the military base to complete the computer project. SEPTA subsequently suspended and then discharged Eidukonis for failing to follow an order of his supervisor.

The district court found that Eidukonis' termination was based solely on his failure to report back from military duty on February 18 and not on any prior military leaves, failure to provide sufficient notice, breaking of promises about seeking further military duty, or other reason. The court noted that there was evidence in the record that Eidukonis disliked Boyd and other supervisors and once stated that he was requesting additional leave because of SEPTA's failure to grant him a promotion. The court found, however, that what Eidukonis did or failed to do in notifying his supervisor of his extended duty, accepting the extension, and failing to report to work did not amount to bad faith. The court stated that its decision might have been different had Boyd previously established and communicated to Eidukonis certain terms and conditions of duration of leaves and amount of notice required. The court concluded, however, that "[u]nder all the circumstances" Eidukonis' refusal to return to work on February 18 was "not unreasonable," App. at 524, because Eidukonis was in the middle of an important military project, had consistently been granted large amounts of military leave on request without objection in the past, and had been given absolutely no warning or notice that this policy had changed.

The court thus found SEPTA in violation of the Veterans' Reemployment Rights Act, which it interpreted as requiring employers to reinstate employees after military duty unless the employees "acted unreasonably with regard to ... taking ... military leave." App. at 527. The court awarded Eidukonis $83,526.29 in damages, reflecting loss of income and pension benefits, out-of-pocket medical and dental expenses and pre-judgment interest.

## II.

■ SEPTA argues that the district court erred as a matter of law in applying the reasonableness test because it failed to consider as a relevant factor the burden on SEPTA accruing from Eidukonis' latest leave request. Eidukonis, on the other hand, argues that it is inappropriate to apply a reasonableness test to a reservist's military leave and that reservists have an absolute right under 38 U.S.C. § 2024(d) to take military leave of any duration, subject only to a bad faith standard. Our standard of review for deciding the appropriate rule of law is plenary, as is our review of the district court's application of legal standards to the facts of the case. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir.1981). We turn first to the issue of the appropriate standard to be applied to employee requests for military leave.

The Veterans' Reemployment Rights Act (the Act), also known as the Vietnam Era Veterans' Readjustment Assistance Act of 1974, was originally enacted in 1940 to assure the right of veterans of World War II to reinstatement to the jobs they held before they went on active duty. Over the years, the Act was extended to cover, *inter alia*, National Guardsmen and members of the Reserve services. *See Monroe v. Standard Oil Co.*, 452 U.S. 549, 554–56 & n. 10, 101 S.Ct. 2510, 2513–15 & n. 10, 69 L.Ed.2d 226 (1981). In its present form, there are two key provisions, codified at 38 U.S.C. § 2021(b)(3) (Supp.1986) and 38 U.S.C. § 2024(d) (1982). Section 2021(b)(3) provides that a private employer shall not deny any person "retention in employment,

or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces." The purpose of this provision was to "assure[ ] that these reservists will be entitled to the same treatment afforded their coworkers without such military obligations." H.R.Rep. No. 1303, 90th Cong., 2d Sess. 3 (1968).

Section 2024(d) provides that an employee:

> shall upon request be granted a leave of absence by such person's employer for the period required to perform active duty for training or inactive duty training in the Armed Forces of the United States. Upon such employee's release from a period of such ... duty ... such employee shall be permitted to return to such employee's position with such seniority, status, pay, and vacation as such employee would have had if such employee had not been absent for such purposes.

This provision has its origin in legislation enacted in 1960 which was "designed to provide reemployment protection for trainees who are absent from employment for only a short period of time ... [*i.e.*,] 2-week annual encampments, and training or instruction periods that may last for 30, 60 or 90 days." S.Rep. No. 1672, 86th Cong., 2d Sess. (1960), *reprinted in* 1960 U.S.Code Cong. & Admin.News 3077, 3078. *See also*

H.R.Rep. No. 1263, 86th Cong., 2d Sess. 6 (1960) ("those individuals on active duty training under orders which contemplate service of less than 3 months and all other training ... for lesser periods of time are covered by this section"). Thus, although 38 U.S.C. § 2024(d) does not contain on its face any limitation of the duration of the leave of a reservist for the purpose of carrying out duty for training, it appears that Congress contemplated relatively short leaves.

The Supreme Court has also signified such an interpretation of the legislative history since it stated that the provision "now codified at 38 U.S.C. § 2024(d), was enacted in 1960 to deal with problems faced by employees who had military training obligations lasting less than three months." *Monroe*, 452 U.S. at 555, 101 S.Ct. at 2514. The dissenting Justices in *Monroe* also construed section 2024(d) to apply "to reservists whose commitments are less than three months." *Id.* at 566–67, 101 S.Ct. at 2520 (Burger, C.J., dissenting). We do not suggest that section 2024(d) is by its terms inapplicable to reservists who take more than 90–day leaves, an argument that has not been made by SEPTA.[3]

Eidukonis points to nothing in the legislative history of section 2024(d) to indicate that Congress contemplated that it was authorizing reservists to take leaves of unlimited duration for Reserve service.[4]

**3.** Section 2024(d) applies to "[a]ny employee not covered by subsection (c) of this section ..." Section 2024(c) applies to "[a]ny member of a Reserve component ... who is ordered to an *initial* period of active duty for training of not less than twelve consecutive weeks" (emphasis added). As explained in the legislative history, the provision now codified at section 2024(c) was enacted to provide the same protection to National Guard members as granted reservists under the Reserve Forces Act of 1955, under which reservists "would perform an initial period of active duty for training of 3 to 6 months in duration and then would participate actively in Reserve units." S.Rep. No. 1672, 86 Cong., 2d Sess. (1960), *reprinted in* 1960 U.S.Code Cong. & Admin.News 3077.

**4.** The Secretary of Labor has been given the statutory authority to assist persons covered by the Act in obtaining replacement to their former positions, a function s/he performs through the Office of Veterans' Reemployment Rights

(OVRR), 38 U.S.C. § 2025. In internal correspondence, the Associate Solicitor for Labor expressed the view that coverage under section 2024(d) was limited to leaves of 90 days or less. *See* H.R.Rep. No. 782, 97th Cong., 2d Sess. 8 (1982). Although the House of Representatives passed a bill that would have provided that employers need not grant leaves of absence of more than 365 days within every three years for members of the Reserve services, *see* 128 Cong. Rec. 23,458 (1982), this aspect of the House bill did not survive the compromise agreement between the House and Senate. The Conference Committee, however, stated that the Solicitor of Labor's policy was not well founded "either as legislative interpretation or application of the pertinent case law." 128 Cong.Rec. 25,513 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 3012, 3020. This statement, which was made long after section 2024 was passed and which did not accompany a successful amendment to the statute, is not an author-

That, however, is what Eidukonis' proffered construction of section 2024 would impose. If the right to take leave would be subject only to a bad faith limitation, it would in effect be unlimited in duration.

The district court and the two circuits to consider the issue held that the grant of a right to employees to take military leave on request in 38 U.S.C. § 2024(d) embodies an implicit requirement that the request for leave be reasonable. *See, e.g., Gulf States Paper Corp. v. Ingram,* 811 F.2d 1464, 1468 (11th Cir.1987); *Lee v. City of Pensacola,* 634 F.2d 886, 889 (5th Cir.1981). Application of a reasonableness standard is consistent with Congress' recent joint resolution urging the nation's employers to cooperate with the Reserve services scheme. *See* Pub.L. No. 99–290, 100 Stat. 413 (1986). An interpretation of section 2024(d) that gave employees the right to leave on demand for all, almost all, or even the substantial part of the work year without consideration of the legitimate needs of civilian employers for continuity and dependability among their workforce would be counterproductive to the spirit of the joint resolution because it could deter the hiring of members of the Reserve services. While Congress expects employers to be patriotic, we do not believe that it expects them to forego all legitimate business concerns. *See Lee,* 634 F.2d at 888 (Congress "did not intend ... to endow a reservist with unreasonable powers over his employer or cause his employer unreasonable hardship" (quoting from district court opinion)).

Although the Act is "to be liberally construed for the benefit of the returning veteran," *Coffy v. Republic Steel Corp.,* 447 U.S. 191, 196, 100 S.Ct. 2100, 2104, 65 L.Ed. 2d 53 (1980), its nondiscrimination provision, section 2021(b)(3), does not grant reservists the right to preferential accommodations by their employers, *see Monroe,* 452 U.S. at 561–65, 101 S.Ct. at 2517–19 (employer need not make work-scheduling accommodations for reservists not made for other employees); *Waltermyer v. Aluminum Co. of Am.,* 804 F.2d 821, 824–25

(3d Cir.1986) (reservists' rights must equal, not exceed, those of other employees); *see also* H.R.Rep. No. 1303, 90th Cong., 2d Sess. 3 (1968). Section 2024(d) was animated by the same congressional interest in protecting the civilian employee who serves time with the military as lay behind section 2021(b)(3). There is no reason why the legitimate interests of the employer and fellow employees should be taken into consideration in one situation but not the other. Therefore, we conclude that a standard which evaluates an employee's request for leave and the civilian employer's response on the basis of reasonableness under all of the circumstances is the appropriate one to use under 38 U.S.C. § 2024(d).

### III.

The two courts of appeals which have adopted the reasonableness standard for evaluating the employee's leave request and the employer's response have differed in their view of the relevant factors to be considered. In *Lee v. City of Pensacola,* 634 F.2d 886 (5th Cir.1981), the employee, a police officer in the City of Pensacola, was also a captain in the Florida Army National Guard. He was granted leave for 59 days to attend a specialized training course and while there learned that he might, if he wished, receive an extended order to stay almost five months more for the completion of the remaining phases of the course. After receiving assurance from the military legal adviser that his civilian employment rights would continue, Lee sought permission a few days before the expiration of his original leave to remain on leave. Permission was denied and Lee was eventually dismissed. In ruling on Lee's suit seeking reinstatement, the district court found for the employer, stating that the period for which leave of absence is given " 'must be reasonable both in the context of the reservist's military obligation *and* the requirements of the employer.' " *Id.* at 888 (emphasis added) (quoting from district court opinion). The Fifth Circuit affirmed, noting that Lee "completely ignored the

itative indication of Congress' intent. *See, e.g., United States v. United Mine Workers of Am.,*

330 U.S. 258, 281–82, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947).

difficulties faced by the City in carrying out its important police duties." *Id.* at 889.

In *Gulf States Paper Corp. v. Ingram*, 811 F.2d 1464 (11th Cir.1987), the employee in question was a secretary in the corporate planning department and a medic with the Army Reserve. She sought a one-year leave so that she could participate in a licensed practical nurse training program. When the employer denied the request but realized she would leave with or without its permission, it filed a declaratory judgment action. The district court held that the employee's leave request was unreasonable and that therefore Gulf States did not violate the Act in denying the request. On appeal, the Eleventh Circuit reversed. It stated that "[t]he reservist begins with a presumption that her leave request is reasonable," 811 F.2d at 1469, that "burden to the employer alone is not enough to mark a leave request as unreasonable," *id.*, and that absent "questionable conduct of the employee," akin to "bad faith", the reasonableness test most likely will be satisfied. *Id.* at 1470.

We set forth some of the factors that we believe should be considered in evaluating the reasonableness of the request for leave and the response. Because their applicability *vel non* will naturally depend on the circumstances of the particular case, they are illustrative rather than inclusive. We begin with the national importance of Reserve status. It is this factor that impelled Congress to enact section 2024(d) in the first place. It follows that a request for leave to serve the obligatory two-week training period is *per se* reasonable. Obviously, any request to serve during a national emergency would be in the same position.

We also agree with *Lee* and *Gulf States* that the training duty does not have to be "required" to qualify an employee for the benefits of section 2024(d). *See Lee*, 634 F.2d at 889; *Gulf States*, 811 F.2d at 1469. There is evidence in this case that some tours of duty are solicited by the reservists and that, with the exception of the annual training tours, the reservist can decline offers for tours made by the military. Nonetheless, we assume that the military services would not request duty from a reservist which was not in the national interest, and courts owe deference to professional military judgments concerning the training and other needs of the armed services, *see Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973). That does not mean that the inquiry should ignore the employee's option to schedule the military training or other duty at a different time. *See Lee*, 634 F.2d at 889 (other opportunities to complete the six phases of training course would have been available to employee).

Both the *Lee* court and the *Gulf States* court believed that the conduct of the reservist was a relevant factor in evaluating the reasonableness of the request for leave and the response. *Gulf States*, however, appeared to construe the ambit of relevant factors more narrowly, suggesting that the court was "to look for conduct akin to bad faith on the employee's part in determining reasonableness." 811 F.2d at 1469. We believe the inquiry is broader. In fact, even in *Gulf States* the court noted that "the length of time of the requested leave" was an appropriate consideration. *Id.* at 1469. In that connection, it will be relevant whether the leave requested is for an extension rather than for a discrete service finite in time and complete in and of itself.

A request made as early as possible will be more reasonable than one made at the last minute. *See, e.g., Burkart v. Post–Browning, Inc.*, 859 F.2d 1245 (6th Cir.1988) (last-minute notice by employee-reservist insufficient); *Lee*, 634 F.2d at 889 (employee failed to tell employer that he was negotiating for extension of duty); *see also Sawyer v. Swift & Co.*, 836 F.2d 1257 (10th Cir.1988) (upholding termination where employee-reservist failed to give adequate notice). It will be relevant whether the employee previously knew that a leave or an extension thereof was a possibility.

Patently, an employee's bad faith or lack thereof in requesting leave will be relevant. In *Lee*, the employee failed to

disclose to his employer "that he was seeking [an] extension of his training period;" he "waited until he received actual orders amending the original training orders before he communicated with [his employer];" and even after he was notified by his employer that his leave would not be extended, he failed "to discuss with his employer the opportunities which were available to him." 634 F.2d at 889. The *Gulf States* court believed these factors showed Lee's bad faith. *See* 811 F.2d at 1469. We need not decide whether they do because we agree that such factors are all material in evaluating the employee's conduct in determining his or her reasonableness. While it would also be relevant that the employee inquired of the military legal officer and followed the advice given, that alone is not dispositive. *See Lee,* 634 F.2d at 888 (court found Lee's conduct unreasonable although he had checked with a military legal adviser). The military may view an employee's right under section 2024(d) to be unlimited, which, as we noted above, is not our position.

It is our view that reasonableness must also take into account the legitimate needs of the employer. Although we agree with *Gulf States* that "burden to the employer *alone* is not enough to mark a leave request as unreasonable," 811 F.2d at 1469 (emphasis added), *see also Monroe,* 452 U.S. at 565, 101 S.Ct. at 2519 ("employers may not rid themselves of ... inconveniences and productivity losses by discharging ... employee-reservists solely because of their military obligation"), we believe that such burden must be accorded more than the "nominal significance" which Eidukonis suggests. *See* Brief of Appellant at 30.

Relevant to the employer's needs are the special needs for the particular employee requesting leave, *cf. Lee,* 634 F.2d at 889 (police officer ignored difficulties department would have in carrying out police duties in his absence); the employer's ability to find a substitute to assume the employee's duties; special circumstances concerning the work load during the particular period for which the leave is requested;

and the extent of the additional costs incurred by the employer if it were to accommodate the reservist's request. Because any leave will impose some costs on the employer, *see Monroe,* 452 U.S. at 565, 101 S.Ct. at 2519, this fact in itself is not enough to make the denial of leave reasonable.

Also relevant to the reasonableness of the employer's position is the clarity with which it has informed its employees of its policy on the duration, repetition, timing, and notice required for leaves for Reserve duty. The employer cannot refuse requests for military leave in such a way as to violate the nondiscrimination requirement of 38 U.S.C. 2021(b)(3), such as by denying leaves for military duty while allowing them for other purposes. In short, although an employer must make reasonable accommodations to permit its employees to take leave for voluntary Reserve duty, it need not accede to every leave request, particularly where the request would require the employee to be absent from work for an extended period of time, during periods of the employer's acute need, or when, in light of prior leaves, the requested leave is cumulatively burdensome.

IV.

Each party, in effect, asks us to make our own determination as to reasonableness from the record developed by the district court. This we are unwilling to do. The balance is not so clear that one party or the other should prevail as a matter of law. There is, for example, substantial evidence in the record that Eidukonis disliked Boyd, that he failed to notify Boyd promptly of his projected military leaves and preferred instead to "play poker" (in his words), *see* App. at 224, 468a, because of his dissatisfaction with his failure to receive a promotion, and that he was aware from West's communication directly to him and from Wert's inquiries to his superiors in the Reserves that SEPTA was unhappy with his extended leaves. In addition, Eidukonis was aware that his SEPTA department was undergoing a particularly busy

period during the budget cycle, that the move to a new location strained its resources, and that it was difficult to obtain employees to substitute for him. On the other hand, Eidukonis was concededly doing significant work for the military and had never specifically been told before February 11, 1985 that his extended leaves for military duty were unacceptable to SEPTA nor been given any guidance as to SEPTA's policy. The balance to be made in this case is one for the district court in the first instance.

It is evident that the district court considered at least some of the foregoing factors in finding that it was reasonable for Eidukonis to extend his leave in the face of SEPTA's request that he return to work on February 18, 1985, but it may not have considered all. Because of the absence of any governing opinions by this court, the district court may have believed that it was not permissible for it to consider the employer's situation in evaluating reasonableness. It is also possible that the court believed that Eidukonis' conduct could be judged only in terms of whether or not he acted from bad faith. Under these circumstances, we will remand this case so that the district court can reconsider its findings and make such additional findings of fact and conclusions of law as may be necessary to accord with the test of reasonableness set forth above.[5]

### V.

The dissent argues that we have produced an "elusive precedent" and have used an "incorrect" standard. Dissenting Typescript Op. at 4. The dissent, however, agrees that the relevant inquiry is one of "reasonableness" and that the burden on the employer can be considered. *Id.* at 6. The dissent believes that the majority opin-

ion is "confusing on the issue of how much weight should be accorded to the employer's interests." *Id.* at 3. The difficulty in quantifying the exact weight of factors to be considered in a balancing inquiry is hardly new. In place of the majority's elucidation of factors, the dissent would substitute factors such as whether the employee acted *"highly* unreasonably" and whether he was guilty of *"questionable* conduct," *id.* at 8, inquiries which are not themselves models of quantification. It would appear, therefore, that the major substantive difference between the majority and the dissent is that the dissent would accord a "strong presumption of reasonableness" to the employee's actions, *id.* at 6, a presumption for which we find no basis in the legislative history or in the Supreme Court's decision in *Monroe,* a case in which the employee's effort to get a special preference was rejected.

### VI.

For the reasons set forth above, we will vacate the district court's order and remand for further consideration in accordance with this opinion.

BECKER, Circuit Judge, dissenting.

I readily concede that Mr. Eidukonis is not a sympathetic plaintiff. I nonetheless find myself unable to join in the majority opinion.

The result of this appeal depends on the legal standard applied. I believe that the language of 38 U.S.C. § 2204(d) and the Supreme Court's interpretation of a similar provision compel the adoption of an approach akin to the one adopted in *Gulf States Paper Corp. v. Ingram,* 811 F.2d 1464, 1468 (11th Cir.1987)—an approach that looks solely to the reasonableness of

---

5. SEPTA argues that the district court abused its discretion in refusing to hear the testimony of its expert witness who served as an ombudsman with a Department of Defense project aimed at resolving reservist-employer conflicts. SEPTA offered this witness for his testimony about typical reservist practices in requesting leave and providing notice to their employers. The district court ruled that this testimony would not be helpful to it as trier of fact since it already

understood the Reserve services system, SEPTA's leave policy, and Eidukonis' conduct in relation to it. This ruling may have been affected by the court's understanding of the reasonableness test as more limited than that developed here. On remand, the court may wish to reconsider the helpfulness of the proffered testimony in light of the test established in this opinion. We express no opinion on its ruling, which is one committed to its sound discretion.

the employee's action and accords it a strong presumption of reasonableness. *See* 811 F.2d at 1468. Applying a modified *Gulf States* principle, which is more favorable to the reservist than that adopted by the majority, *see infra*, I would affirm. I do not think that the standards espoused in *Gulf States* and *Lee v. City of Pensacola*, 634 F.2d 886, 889 (5th Cir.1981), can be reconciled in the way that the majority has attempted, and, more important, I think that the *Lee—Gulf States* combination formula derived by the majority is not only legally incorrect but will be difficult for district courts to apply.

It is important to note that if SEPTA had established clear and reasonable leave policies, which Mr. Eidukonis violated, or if the district court had found that the pattern of absences had been the cause of his discharge, rather than finding that "[p]laintiff was terminated by SEPTA solely because of his failure to report back from military duty on February 18, 1985," Dist.Ct.Op. at 7 (May 17, 1988), Mr. Eidukonis might have failed even my more generous standard. Faced with the present record, however, I see no alternative but to uphold the judgment of the district court.

## I.

The majority attempts to reconcile the *Lee* and *Gulf States* cases as both adopting a "reasonableness" standard. I do not believe that they can be so reconciled. The Fifth Circuit's approach in *Lee* is not completely clear, but it seems to involve an inquiry into the totality of the circumstances to ascertain whether the reservist-employee's leave request was reasonable. *See Bottger v. Doss Aeronautical Services, Inc.*, 609 F.Supp. 583, 585 (M.D.Ala. 1985) (describing *Lee* as adopting a "totality of the circumstances" test). In *Lee*, the Court reasoned that in enacting 38 U.S.C. § 2024(d) (1982), Congress could not have intended " 'to permit employees who have been granted military leave to remain on such leave unnecessarily and at their own convenience to the detriment of the legitimate concerns of their employers.' " 634 F.2d at 889 (quoting district court's opin-

ion). With this in mind, the *Lee* court looked at the length of the leave, the amount of notice Lee gave his employer, whether Lee could have scheduled his training at other times, and the burden that Lee's absence caused his employer. *Id.*

In *Gulf States*, the Eleventh Circuit, although purporting to apply *Lee*, tilted the *Lee* standard more in favor of the reservist-employee. *See* 811 F.2d at 1468–70. Under the *Gulf States* standard the court must "look for conduct akin to bad faith on the employee's part in determining reasonableness." *Id.* at 1469. *Gulf States* further held that the employee's actions should be accorded a "presumption of reasonableness." And it noted that a "burden to the employer alone is not enough to mark a leave request as unreasonable." *Id.* There must also be "questionable conduct on the part of the employee." *Id.* at 1470.

Though it adopts essentially the same factors to assess reasonableness which the *Gulf States* court did, *see* Maj.Op. at 697, the majority here expressly rejects the "akin to bad faith" approach of *Gulf States*. *See* Maj.Op. at 697. Although the majority holds that courts should consider "the legitimate needs of the employer," in addition to the *Gulf States* factors, *id.* at 697, its opinion is, I believe, somewhat confusing on the issue of how much weight should be accorded to the employer's interests. The majority adopts the language from *Gulf States* that burden on the employer alone is not enough to justify dismissal, but, unlike *Gulf States*, does not specify what extra factor is needed to establish unreasonableness. The majority has thus adopted a totality of the circumstances standard, but has given the district courts little guidance on how to assess the relevant information. Moreover, it has not made clear whether reasonableness should be presumed or whether the reservist has the burden of establishing it.

In sum, I believe that the majority's effort to reconcile *Lee* and *Gulf States* has produced an elusive precedent which will be difficult to apply and which will make it impossible for reservists and their lawyers

to predict with any degree of certainty how they will fare under any given set of circumstances.

## II.

More significantly, I believe that the standard espoused by the majority is incorrect because it does not protect the reemployment rights of reservists to the degree required by Congress. Title 38 U.S.C. § 2024(d) is written broadly, mandating that leave for reserve duties "shall upon request be granted," and that reservists "shall be permitted to return to [the] position[s] [that they] would have had if [they] had not been absent for such purposes." Furthermore, the Supreme Court, in construing a similar provision of the statute, 38 U.S.C. § 2021(b)(3) (1982 & Supp. IV 1986), stated that "[t]his Court does not sit to draw the most appropriate balance between benefits to employee-reservists and costs to employers. That is the responsibility of Congress." *Monroe v. Standard Oil Co.,* 452 U.S. 549, 565, 101 S.Ct. 2510, 2519, 69 L.Ed.2d 226 (1981). In *Monroe,* the Supreme Court noted that

> [t]he frequent absences from work of an employee-reservist may affect productivity and cause considerable inconvenience to an employer who must find alternative means to get necessary work done. Yet Congress has provided in § 2021(b)(3) that employers may not rid themselves of such inconveniences and productivity by discharging ... employee-reservists solely because of their military obligations.

*Id.* Similarly, in enacting § 2024(d), Congress has provided that employers may not rid themselves of the burden of having employees who are members of the Army Reserve by refusing to reinstate them after their leave.[1]

Despite this background, I agree with the majority that the right of reservists to take military leave should not be absolute. *See* Maj.Op. at 695. It is true that we generally bow to the plain meaning of a statute. *See Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 24–26, 97 S.Ct. 926, 940–42, 51 L.Ed.2d 124 (1977). However, it has long been a maxim of statutory construction that " '[g]eneral terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character.' " *Government of Virgin Islands v. Berry,* 604 F.2d 221, 225 (3d Cir.1979) (quoting *United States v. Kirby,* 74 U.S. (7 Wall.) 482, 486–87, 19 L.Ed. 278 (1868)). Were we to read § 2024(d) as creating an absolute right of reinstatement, reservists would be allowed to play fast and loose with the system in a way that Congress could not have intended. However, given the considerable breadth of the right accorded to reservists by the literal terms of the statute, and the Supreme Court's pronouncement that the balance between the employer and the employee is for Congress to strike, I would create only a very narrow exception to the reservists' general right to be reinstated after military leave.

More precisely, I would adopt a standard much like the one adopted by the Eleventh Circuit in *Gulf States.* I would hold that the relevant inquiry is whether the employee's actions have been reasonable, and I would accord a strong presumption of reasonableness to them. An employer could rebut this presumption only by presenting evidence that the employee acted highly unreasonably. I use a "highly unreasonable" standard rather than the "akin to bad faith" standard articulated in *Gulf States* for two reasons. First, I find the term "akin" to be somewhat confusing in this context. Second, I think that adopting a

---

1. The legislative history of § 2024(d) is not particularly helpful in determining what standard we should adopt. As the majority points out, there are some references in the history to the fact that when deliberating about the statute, Congress was primarily thinking about military leaves of less than 90 days. *See* Maj. Op. at 693. But the majority itself concedes that these references are not dispositive, and there is no clear indication of congressional opinion with respect to the question of how great a burden employers should be required to bear. The legislative history simply does not discuss the possibility or contours of a "reasonableness test."

"bad faith" formulation may put too much of a burden on employers by requiring them to offer proof about the mental state of the reservist.

The burden on the employer is not wholly irrelevant to this inquiry, but I agree with the Eleventh Circuit that a court should consider whether the leave has caused hardship to the employer only if the reservist has engaged in "questionable conduct." *Gulf States*, 811 F.2d at 1470. For example, a reservist's failure to notify his employer as soon as practicable that he would be taking leave could be a questionable act, as could an employee's violation without good cause of an employer's established reasonable leave policy. Such instances, if they are sufficiently egregious, may be in and of themselves highly unreasonable. Alternatively, they may be considered highly unreasonable even if they are somewhat less egregious, if the employee was aware that they would cause significant hardship to the employer.

### III.

I accept the facts as described by the majority, which, as I have observed, do not paint a sympathetic picture of Mr. Eidukonis. What is legally significant, however, under the standard I would apply is the district court's finding that Mr. Eidukonis

> was terminated by SEPTA solely because of his failure to report back from military duty on February 18, 1985, and not because of any previous military leaves, not because when he took those military leaves, not because of when he took the military leave that was—that ended on February 16, 1985, not because of notices given concerning those leaves, not because of the number of his prior military leaves, not because of the length of his military service ... and not because he broke any promises about seeking military duty.

Dist.Ct.Op. at 7. This factual finding is not clearly erroneous. Indeed, it is supported by statements made by SEPTA's representatives at trial. *See* Trial Trans. at 86–87 (May 3, 1988).

In light of this finding, the only relevant issue is whether Mr. Eidukonis acted highly unreasonably in failing to report to work at SEPTA on February 18, 1985. I believe that he did not. Mr. Eidukonis notified SEPTA "within three days of learning that [the extension] had been approved" that he would be extending his leave. Dist.Ct.Op. at 8. He was in the midst of an important computer project, about which he had developed special expertise. *See id.* And SEPTA did not notify him that there were limits on the amount of leave a reservist could take, or give him any warnings that he could be fired because of his leave, until after his orders had been issued, and only one week before his February 18 assignment was to begin. I believe that under these circumstances, Eidukonis's failure to return to work on February 18 did not constitute questionable conduct. Consequently, I would not consider the burden that his absence placed on SEPTA.

This might have been a different case if the district court had found that Mr. Eidukonis was fired because of his pattern of leave-taking. That pattern viewed as a whole may well have been unreasonable even under the standard that I propose. But the district court made no such finding. Similarly, this might have been a different case if SEPTA had articulated clear and reasonable policies regarding military leave, and Mr. Eidukonis had willfully violated them. Again, that is not this case. On the record before us, I would affirm the judgment of the district court. I respectfully dissent.