**Kestutis EIDUKONIS**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY.**

**Civ. A. No. 86–5142.**

United States District Court, E.D. Pennsylvania.

Feb. 27, 1991.

Robert G. Bauer, Philadelphia, Pa., for plaintiff.

Saul H. Krenzel, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

In this matter, plaintiff sued Southeastern Pennsylvania Transportation Authority after being dismissed as a production control specialist. Plaintiff claimed defendant violated the Veteran's Reemployment Rights Act, 38 U.S.C. § 2021 et seq., and after a four day bench trial, I found in his favor.

On appeal, the Third Circuit remanded with guidelines for analyzing plaintiff's dismissal, 873 F.2d 688. This memorandum and order decides the case in accordance with those instructions.

## I. FACTS

### A. *The Original Facts.*

After the trial of this matter, I made the following findings of fact:

1. Plaintiff, Kestutis Eidukonis, is an adult male residing at 248 East Broad Street, East Stroudsburg, Pennsylvania.

2. Defendant, Southeastern Pennsylvania Transportation Authority (SEPTA), is a duly organized corporate authority which maintains an office at 1515 Market Street, Philadelphia, Pennsylvania.

3. Plaintiff started employment with SEPTA as a production control specialist on April 20th, 1981.

4. At the time he applied for his position at SEPTA, plaintiff stated on his application for employment that he was a member of the United States Army Reserve.

5. At all times relevant to this case, plaintiff was a major in the United States Army Reserve.

6. To maintain active status in the Army Reserve, a reservist must accumulate 50 points in one year. Fifteen points are automatic for maintaining an active status. The other 35 points can be obtained by going on two-weeks annual training [duty], taking correspondence courses, and by attending drills.

7. Any points obtained in excess of 50 points cannot be applied by a reservist to another year. Additional points accumulated in one year are, however, factored into the reservist's pension benefits.

8. A reservist must express willingness to accept military duty which exceeds two weeks. A refusal to take training beyond the two-week annual training in theory will not adversely affect a reservist's status. However, in practice, a variety of assignments and experiences may enhance the potential for promotion.

9. SEPTA provided to its supervisory, administrative, or management employees a handbook which set forth the company's employment policies, including those pertaining to military leave.

10. Prior to February 5, 1985, SEPTA had no written employment policy which limited the right of an employee to take leave for the performance of military duty.

11. While employed at SEPTA, plaintiff was granted military leaves so that he could go on military duty as follows: In

636

1981, from April 24th to September the 26th, 153 days; in 1982, from April 21st to September the 13th, 144 days; in 1983, from June 10th to July 11th, 32 days; from July 31st to August 26th, 27 days; from October 3rd to October 31st, 29 days, a total of 88 days. In 1984, and 1985, from August the 13th of 1984 to August the 26th of 1984, 14 days; from September the 5th of 1984 to September the 30th of 1984, 26 days; from October the 1st of 1984 to February the 17th of 1985, 140 days.

12. In each instance, SEPTA consented to plaintiff's taking employment leave so that he could perform military duty with the Army Reserve.

13. In each instance, plaintiff notified his supervisor orally of his plans for military service and later confirmed these periods of absence from employment in writing.

14. In 1984, the department in which Mr. Eidukonis worked at SEPTA was burdened because it was being moved from one location to another. Accordingly, Mr. Eidukonis' supervisor, Ollin Boyd, stated that all individuals should postpone their vacation plans until the summer of 1984 so that there would be no conflict with the moving of the department.

15. In the spring of 1984, Mr. Eidukonis discussed his two-weeks annual training duty with Mr. Boyd stating it was planned for August. Mr. Eidukonis also stated that he would not be taking additional time for military training that year beyond the two weeks in August.

16. Plaintiff's military service from September 5th to September 30th, 1984, was performed at Fort Indiantown Gap. During this tour of active duty, plaintiff was assigned the task of preparing a computerized schedule for the weapons' firing ranges at Fort Indiantown Gap. This program involved the efficient use of training facilities and the safety of military personnel. It involved obtaining the necessary hardware and creating the necessary computer programs.

17. Plaintiff's tour at Fort Indiantown Gap was extended from October 1st, 1984, to February 16th, 1985, so that he could continue the work on the firing-range scheduling program.

18. SEPTA consented to plaintiff's military leave from August 13 to August 26, 1984, his vacation of one week, which followed, his military duties from September 5 to September 30, 1984, and his military duties from October 1st, 1984, to February 17th, 1985.

19. In notifying SEPTA of his periods of military duty, plaintiff followed the same procedure that he had followed as to previous requests for duty or extensions; that is, he notified his supervisor of the periods of active duty and followed up oral notification in writing.

20. No one at SEPTA, either orally or in writing, advised plaintiff of any objection to any period of leave, the time of year he took that leave, the manner in which his requests for military leave were submitted, or the amount of notice given to SEPTA of the requests for military leave.

21. In November, 1984, defendant's attorney, Vincent Walsh, called Fort Indiantown Gap and asked whether plaintiff was in fact on military duty there. Plaintiff was informed of this call by Major Dennis Olgin who had received it. Thereafter, Mr. Walsh wrote a follow-up letter to the military authorities at Indiantown Gap making a similar request for information and plaintiff knew of that letter.

22. On October 29, 1984, plaintiff informed his immediate supervisor, Ollin Boyd, that his 140 day period of active duty with the Army might be extended. He told Boyd that he was doing vital work for the Army and that he was the only one that the Army felt was competent to be placed in such a critical position.

23. On February 5, 1985, the Army approved a request from Fort Indiantown Gap that plaintiff's period of active duty be extended for 26 days so that he could complete his firing range scheduling assignment.

24. On February 8, 1985, plaintiff told his immediate supervisor, Ollin Boyd, of

the fact that his period of military service was being extended.

25. By letter dated February 11, 1985, Mr. Boyd advised plaintiff that if he did not return to work at SEPTA on February 18, 1985, his employment status at SEPTA would be placed in jeopardy.

26. February 18, 1985, was the first SEPTA workday following plaintiff's completion of the tour of active duty that started October 1, 1984.

27. Plaintiff did not report for work on February 18, 1985, at SEPTA, but remained at Fort Indiantown Gap where he was still on military duty as a result of the 26–days extension of the period of service that had been scheduled to terminate on February 16, 1985.

28. Plaintiff was terminated by SEPTA solely because of his failure to report back from military duty on February 18, 1985, and not because of any previous military leaves, not because of when he took those military leaves, not because of when he took the military leave that ended on February 16, 1985, not because of notices given concerning those leaves, not because of the length of his military services, not because of his job performance, not because he had made derogatory comments about SEPTA supervisors, not because of his desire for a transfer, and not because he broke any promises about seeking military duty.

29. Plaintiff's tour of duty at Fort Indiantown Gap was extended and re-extended on September 5, 1984, until March 15, 1985.

30. By orders dated November 23rd, 1984, plaintiff was ordered to active duty for training at Fort Monroe, Virginia, to commence March 18, 1985. Plaintiff did not inform his supervisor, Ollin Boyd, until February 8, 1985, of the orders for his active duty for training at Fort Monroe, Virginia.

31. When plaintiff was told by Ollin Boyd to report to work·on February 18, 1985, or that his continued employment status at SEPTA would be in jeopardy, plaintiff consulted the legal officer at Fort Indiantown Gap, Major Dennis Olgin. Major Olgin advised plaintiff that SEPTA could not terminate him because of his continued military duty and his failure to report for work on February 18, 1985.

32. Plaintiff acted reasonably and in good faith in notifying Mr. Boyd in October, 1984, that his period of active duty might be extended; in notifying Mr. Boyd of that extension within three days of learning that it had been approved; and in accepting the extension and completing an important assignment at Fort Indiantown Gap.

34. Under all the circumstances, plaintiff was not guilty of any bad faith towards SEPTA.

35. Under all the circumstances, plaintiff's refusal to return to work on February 18, 1985, was not unreasonable.

36. Under all the circumstances, it was unlawful for defendant to terminate plaintiff's services as its employee.

37. Plaintiff is entitled to recover money damages.

B. *Additional findings of fact made necessary by the appellate decision.*

Following the Third Circuit's remand, I gave both parties the opportunity to offer additional evidence. Neither did so although each submitted additional proposed findings of fact and conclusions of law. The Court of Appeals directed me to apply a reasonableness standard to the conduct of both plaintiff and defendant, taking into account their respective concerns. I therefore make the following additional.

### FINDINGS OF FACT

38. There were only three resource controllers including Mr. Eidukonis at SEPTA during the relevant period.

39. The move to a new building in June of 1984 created logistical problems in the summer of 1984 in the resource controllers' department.

40. At the time of the move, SEPTA increased the resource controllers' responsibility.

41. Both the move and the additional responsibility significantly increased the department's workload.

42. February is a particularly busy period for SEPTA resource controllers. The poor weather increases the need to order materials, and the budget and inventory preparation increases the work load appreciably.

43. SEPTA did not hire another employee to fill in for Mr. Eidukonis, and his temporary replacements were unable to do a satisfactory job.

44. The move, the increased responsibilities, and the general winter work load problems combined during February, 1985, to create particularly acute burdens on the resource controller's department.

45. Mr. Eidukonis was a skilled employee who was especially knowledgeable about the department's financial duties and his presence would have alleviated much of the department's budgetary burden.

46. Mr. Eidukonis knew about the difficulties his department faced in February, 1985

47. Plaintiff wanted to extend military leave that would have lasted for 166 days by an additional 26 days.

48. Plaintiff's request for the additional 26 days was made promptly.

49. Prior to February 11, 1985, SEPTA'S military leave policy so far as it concerned Mr. Eidukonis was to grant his requests.

50. SEPTA did not ask plaintiff to try to schedule his leave for some other time.

51. SEPTA needed plaintiff's services but had not made any significant effort to find a substitute to do his work while he was on military duty.

52. During the 26–day period that Mr. Eidukonis would have been absent had his request for leave been granted, there was no particular project, activity, or job which only Mr. Eidukonis could perform.

53. There was no evidence that firing Mr. Eidukonis solved any of SEPTA's problems that existed in or arose during the 26–day period beginning February 18, 1985.

54. There was no evidence of any attempt on SEPTA's part to obtain Mr. Eidukonis' cooperation in solving SEPTA's problems that would be caused by the extension of his military leave for 26 days.

## II. DISCUSSION

On appeal, the Third Circuit held the Veterans' Reemployment Rights Act, 38 U.S.C. § 2021 et seq., protects Mr. Eidukonis. In addition, the Third Circuit held that to enjoy the Act's protection, Mr. Eidukonis must have acted reasonably under all the circumstances.

In explaining the reasonableness standard, the Third Circuit identified various factors by which to judge reasonable conduct: (1) the nature of the employee's military obligation; (2) the employee's ability to schedule the leave at another time; (3) the length of the requested leave; (4) whether the employee's request was to extend a current leave, or for a discrete term; (5) the promptness of the request; (6) the employee's good faith; and (7) advice given by a military legal officer.

Second, the Third Circuit identified certain employer concerns that bear on reasonableness: (1) the employer's legitimate needs; (2) the employer's need for the particular employee and its ability to find a substitute; (3) the work load during the leave period; (4) the extra cost of accommodating the leave; and (5) the clarity of the company's policy regarding reserve leaves.

The Court of Appeals noted these factors were illustrative, not exhaustive.

### A. *Factors Relating to Mr. Eidukonis' Behavior*

 At the outset, I note Mr. Eidukonis was not serving during an emergency, nor was he participating in his annual two week training period. As a result, his conduct was not *per se* reasonable, and I must balance the appropriate factors to determine reasonableness.

Mr. Eidukonis sought to extend his leave from SEPTA beyond February 17 so he could complete work on a special computer

project for the Fort Indiantown Gap firing range. At trial, Major Stout (the officer in charge of the firing range) described the importance of controlling the range's scheduling problems. He also indicated the base was trying to solve them before the impending and annual summer-through-fall range overcrowding. Finally, there was testimony that replacing Mr. Eidukonis would have created delays because he was the only person well acquainted with the project.

Unquestionably, Mr. Eidukonis was performing important work for the Army. The next question is whether it was possible to delay the 26–day extension to a time that would have been more compatible with SEPTA's needs. There was no suggestion that SEPTA considered such a possibility much less that Mr. Boyd sought to explore it with either Mr. Eidukonis or the Army. Therefore, I conclude Mr. Eidukonis could not reasonably have been expected to reschedule this duty in view of the program's status, his integral role, the need for prompt completion, the absence of any statement from SEPTA of a particular need of equal importance, or a request from SEPTA that the Army accommodate SEPTA's immediate needs.

As to the timing of his request: Mr. Eidukonis notified SEPTA within three days of the Army's approval of his orders. In the past, he was not as prompt. Mr. Eidukonis even admitted to "playing poker" at times by not revealing his plans promptly. In every previous case, though, SEPTA allowed Mr. Eidukonis to serve without ever commenting his notice was insufficient. Under the circumstances, I find Mr. Eidukonis provided sufficient notice on February 8 of his leave request.

Finally, there is the issue of Mr. Eidukonis' good faith. On other occasions, Mr. Eidukonis could have been more forthright with SEPTA. In fact, SEPTA has argued persuasively that Mr. Eidukonis was not candid because of his dislike for SEPTA, and his superiors (particularly Ollin Boyd), his anger over not being transferred to another department, and his ability to make more money as a reservist. All these things may have been true about the past, but Mr. Boyd said they had nothing to do with his firing Mr. Eidukonis. The fact that Mr. Eidukonis had been told by a legal officer at the base that SEPTA could not discharge him for failing to report on February 18 is further evidence of plaintiff's good faith behavior.

### B. *Factors Relating to SEPTA*

■ Mr. Eidukonis was undoubtedly an important member of his department. Because only three people shared the work, his absence placed a great deal of pressure on his compatriots. Nonetheless, SEPTA did not hire another resource controller and Mr. Boyd knew its temporary replacements were grossly inadequate. During Mr. Eidukonis' duty at Fort Indiantown Gap, his SEPTA department was especially busy because of the time of year (the budget and inventory were due), new work arrangements (the department had been given more responsibility), and the recent move to a new building.

SEPTA had a legitimate need for plaintiff's services, and he was aware of it. At the same time, though, SEPTA had consistently followed a clear policy for every reserve assignment Mr. Eidukonis ever took. The SEPTA rules do not restrict an employee's right to serve in the military reserves, and they do not restrict the length or timing of service. In every year that Mr. Eidukonis worked at SEPTA, he took extended military leave, and the company never objected. Despite knowing SEPTA's general policy concerning reserve duty and Mr. Eidukonis's previous experience under that policy, Mr. Boyd fired Mr. Eidukonis for not complying with the seven-day notice to return to work.

Another factor relating to SEPTA must be considered: did firing Mr. Eidukonis solve the immediate problems his additional leave would have caused? Neither party presented evidence on this question so we do not know how long it took SEPTA to hire a replacement for Mr. Eidukonis, provide the necessary training, integrate that person into the work system, and conclude the person was satisfactory. In the ab-

sence of evidence to the contrary, experience suggests this process would have exceeded the 26 days Mr. Eidukonis would have taken to finish the Army project. From SEPTA's inability to provide a ready substitute on other occasions when Mr. Eidukonis was on reserve duty, I conclude that firing Eidukonis did not overcome SEPTA's immediate difficulties unspecified and ill-defined as they were, but only made them worse. Whether firing him solved SEPTA's long-range problems I do not know, but I do know SEPTA made no effort to enlist Eidukonis' cooperation with regard to those long range problems.

As I noted in my original findings, had SEPTA given Mr. Eidukonis a warning that he needed to change his behavior, reduce his military service, and give more notice, this might be a different case. None of these warnings occurred, though.

For all these reasons, I again conclude Mr. Eidukonis did not act in bad faith when he requested the 26–day extension to finish the firing range project at Fort Indiantown Gap. SEPTA established, at least so far as Mr. Eidukonis was concerned, a clear company policy to approve his leave requests. There was no suggestion that SEPTA presented any alternative to immediate return and none that firing Mr. Eidukonis solved SEPTA's problems. Under all the circumstances, I conclude that while Mr. Eidukonis acted in good faith, SEPTA did not. As a result, I find that SEPTA violated the Veterans' Reemployment Rights Act, 38 U.S.C. § 2021 *et seq.*, when it terminated Mr. Eidukonis' employment.[1]

I previously reached the following conclusions of law.

1. The court has jurisdiction over the parties and the subject matter of this action.

2. Defendant violated the Veterans' Reemployment Rights Act, 38 United States Code, Section 2021, et cetera, when it terminated plaintiff's employment on April 13, 1985.

3. Under the terms of the Act, SEPTA was required to reinstate plaintiff to his position of employment unless he acted unreasonably with regard to his taking of military leave.

4. Under all the circumstances, plaintiff did not act unreasonably with regard to the period of military leave from February 18 through March 15, 1985.

5. Defendant is liable to plaintiff for his lost wages and for losses incident to his employment, as follows:

(a) For loss of income, $60,224.06 plus prejudgment interest at the rate of six percent, compounded annually, $4,266.28, or a total of $64,490.34. As to pre-judgment interest generally, *see Poleto v. Consolidated Rail Corp.*, 826 F.2d 1270, 1274 (3d Cir.1987).

(b) For out-of-pocket medical and dental expenses, $14,007. plus interest at the rate of six percent, compounded annually, $1002.87, a total of $15,009.87.

(c) For loss of pension benefits, $4,026.08.

Those conclusions remain unchanged and to supplement them, I now reach the following additional:

### CONCLUSIONS OF LAW.

6. Plaintiff acted in good faith in requesting additional military leave for 26 days to complete an important military project.

7. SEPTA acted in bad faith by changing its military leave policy as it applied to plaintiff without warning and by discharging him.

8. Plaintiff is entitled to the money damages set forth in the order of June 2, 1988, plus legal interest from that date.

### ORDER

AND NOW, this 27th day of February, 1991, it is hereby ordered that judgment be entered in favor of the plaintiff, Kestutis Eidukonis, and against the defendant, Southeastern Pennsylvania Transportation

---

1. As a final note, the Court of Appeals directed that I consider whether SEPTA could present an expert witness to discuss employment problems between reservists and employers. There is no need for me to do so since SEPTA decided it would not or could not offer that witness.

Authority, in the sum of $83,526.29, plus interest, as provided by 28 U.S.C. § 1961, computed from June 2, 1988.