**Rita J. NOVAK, Plaintiff,**

v.

**Donald P. MACKINTOSH and Dakota Industries, Inc., Defendants.**

**No. CIV 95–4051.**

United States District Court,
D. South Dakota,
Southern Division.

Jan. 30, 1996.

---

**5.** The Leaks are currently being prosecuted for income tax evasion and related offenses.

Bonnie P. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, for plaintiff.

James A. Hertz, Christopherson, Bailin & Anderson, Sioux Falls, SD, for defendant.

## ORDER

PIERSOL, District Judge.

Defendants move for summary judgment on the complaint brought pursuant to the Veterans' Reemployment Rights Act, 38 U.S.C. §§ 2021–27.[1] Doc. 36. Defendants

---

1. The complaint in this action references the Veterans Reemployment Rights Act [VRRA], codified at 38 U.S.C. §§ 2021–27, as amended. The VRRA was renumbered Chapter 43, sections 4301–07 by Pub.L. 102–568, Title V, § 506(a), Oct. 29, 1992, 106 Stat. 4340. Section 2021 was

allege that Plaintiff's dismissal was unrelated to her military duties and that her failure to return to work or apply for reinstatement after her dismissal jurisdictionally bars her suit. Doc. 37 at 3–4. Defendants request, in the alternative, that Defendant Donald P. Mackintosh be dismissed as an improper party. Doc. 37 at 6. Defendants' Motion for Summary Judgment is denied for the following reasons.

## FACTS

Plaintiff Rita Novak, who is represented by the United States Attorney in this action,[2] began work for Dakota Industries, Inc., on March 28, 1989. Complaint at ¶ 5; Mackintosh Deposition at 27 [hereinafter "Mackintosh"]. Novak was a member of the National Guard at the time she went to work for Dakota Industries, and she served in Operation Desert Storm from November 21, 1990, through June 3, 1991. Complaint at ¶ 6; Order 123–04. Upon her return to Dakota Industries, Novak was reemployed, paid $6.50 an hour, and given reduced responsibilities.[3] Complaint at ¶ 6; Mackintosh at 48. For the time period beginning with her departure for Desert Storm and ending with her termination from Dakota Industries, Novak had military obligations on November 19 & 20, 1990,[4] and on January 24, 1992. Declaration of Mark P. Snoozy, Commanding Officer, 323rd Chemical Company [hereinafter "Snoozy"], Doc. 47 at ¶ 6.

On January 16, 1992, Novak informed Mackintosh that she would not be at work on January 23, 1992, because she had a dental appointment,[5] and she informed him that she probably would not be at work on January 24, 1992, because she had a military training

---

[2] transferred without change to § 4301. The VRRA was subsequently amended by the Uniformed Services Employment and Reemployment Rights Act [USERRA], codified at 38 U.S.C. §§ 4301–33, effective October 13, 1994. The USERRA generally applies to reemployments initiated on or after a 60–day period after enactment of the Act, October 13, 1994. Pub.L. 103–353, § 8, Oct. 13, 1994, 108 Stat. 3150. "Reemployment" in this matter was initiated in 1991 when Plaintiff returned from Desert Storm, and in 1992 when Plaintiff attended a training session in Salt Lake City. Therefore, the renumbered VRRA applies. To minimize confusion with the USERRA, the Court will use the former numbers in its discussion.

2. Section 2022 of the VRRA provides, in pertinent part:

> Upon application to the United States attorney or comparable official for any district in which such private employer maintains a place of business ... by any person claiming to be entitled to the benefits provided for in such provision, such United States attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney for such person in the amicable adjustment of the claim or in the filing or any motion, petition, or other appropriate pleading and the prosecution thereof specifically to require such employer to comply with such provisions.

38 U.S.C. § 2022 (1991).

3. There is a dispute regarding Novak's pay at the time she left for Desert Storm due to Dakota Industries inability to produce the original of a "Change of Status" form which indicates a change from "Office & Personnel Manager" to "General Manager" on October 12, 1990, with a corresponding increase in salary from $6.50/ hour to $7.00/hour. See Mackintosh at 31–48 and Ex. 7 & 7A. Mackintosh contends that, if the Change of Status document is genuine, the position of "General Manager" was only anticipatory, and that Novak could not have been rehired as General Manager upon her return from Desert Storm because the position never existed. Mackintosh at 40–41. Mackintosh did testify that Novak's duties were reduced upon her return from Desert Storm. Id. at 48. As this is a motion for summary judgment, all inferences are drawn in favor of the non-moving party, here the plaintiff, and her submission to the Court of a copy of her Change of Status form establishes a prima facie case for Dakota Industries' failure to reinstate Novak "to a position of like seniority, status, and pay[.]" 38 U.S.C. §§ 2021(b)(3) and 2021(a)(A). See Hansen v. Town of Irondequoit, 896 F.Supp. 110, 113 (W.D.N.Y.1995) (setting out "burden shifting" analysis as it applies to the VRRA).

4. Order 123–04, dated November 17, 1990, ordered the 323d Chemical Company to 180 days active duty beginning on November 21, 1990. Order 035–0S4, dated November 21, 1990, ordered Novak to annual training for two days plus allowable travel time, beginning on November 19, 1990.

5. It is undisputed that Novak attended and represented Dakota Industries at a trade show in Denver in January of 1992 and returned without her false teeth. Doc. 48 at 4–5; Mackintosh at 97. Apparently, Novak became flushed her false teeth down the toilet, thereby necessitating their

class. Answer, Doc. 7 at ¶ 7; Complaint, Doc. 1 at ¶ 7; Declaration of Rita J. Novak, Doc. 48 at 6. On January 22, Mackintosh refused Novak permission to keep the dental appointment, and, with respect to her military obligation, told her that if she was going to obey her training orders, she was to turn in her keys.[6] Mackintosh at 97–98. Mackintosh called Novak's commanding officer on January 22 and threatened to fire her if she was not at work on Friday, January 24. Snoozy, Doc. 47 at 2; Mackintosh at 97.[7] Novak kept her dental appointment and her military obligation in Salt Lake City as ordered. Doc. 48 at 7. Novak received a check on January 25 with the notations, "Final Check" and "This represents final and total payment for all amounts due form Dakota Industries, Inc." Doc. 48 at Ex. 6. Novak did not return to work at Dakota Industries, and filed the instant suit on June 8, 1994.

## SUMMARY JUDGMENT

■ The Court must grant Defendants' motion for summary judgment if there is no genuine issue of material fact for trial and Defendants are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]here is no issue for

trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "[T]rial courts should believe the evidence of the party opposing summary judgment and all justifiable inferences should be drawn in that party's favor." *Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 271 (8th Cir.1992). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510.

## VETERANS REEMPLOYMENT RIGHTS ACT

■ The Veterans Reemployment Rights Act [VRRA] was originally enacted to permit reinstatement of veterans of regular military service to positions left or positions of "like seniority, status, and pay." 38 U.S.C. § 2021(a). The Act also protected regular veterans from discharge without cause for one year after reinstatement. 38 U.S.C. §§ 2021(b)(1). Reservists are protected by § 2024(d) which requires employers to grant

replacement and the dental appointment on January 23, 1992. Doc. 49 at ¶ 15.

6. The following exchange occurred between the Assistant U.S. Attorney and Mackintosh:

Q: How did you make the decision to terminate Ms. Novak?
A: I didn't. Ms. Novak happily made it for us.
Q: And how did she do that?
A: Well, again, it was a direct insubordination. She puked up her teeth, her false teeth, and she had elected to take a Thursday dental appointment. She sprung this on me practically right up on the date that it was due, and I said, no, you cannot take a—another workday off. You're going to be here Thursday. Now, at no time did I ever say, you're fired, Rita. I didn't have to. Rita did it for us.
At 4:30 on Wednesday, having seen her orders that she was to report for guard duty—or reserve duty on Friday, 8:00 o'clock Friday morning, at 4:30 on Wednesday she walked out. And I said, are you going to—and it was somewhat of a rhetorical question—are you going to go—obey these orders, I think is what

I asked. She said, yes. I said, then give me your keys. That is the full extent of the last time I ever saw Rita as far as the company was concerned.
Q: You didn't consider you were terminating her at that time?
A: No. No. Why—there was nothing said about terminating her. What was said is that she could not take Thursday off. I picked up her keys in anticipation of her being gone, period. I had done this I think five or six times before. When she went to summer camp in 1989, we picked her keys up.
Mackintosh at 97–98.

7. The deposition testimony of Mr. Mackintosh includes the following:

Q: Do you recall telling Ms. Novak's commanding officer on January 22nd, 1992 that if she didn't show up on January 24th, she would be out of a job?
A: I recall exploring that with everybody I talked to.
Q: I'm asking you whether you recall telling the commanding officer that?
A: No, I don't recall specifically. It would not be out of line for why I was calling people.

reservist-employees a leave of absence in order to train. Reservists are further protected by § 2021(b)(3) which extends the protections of § 2021(a) to reservists. 38 U.S.C. § 2021(b)(3). As the Supreme Court stated:

> The legislative history thus indicates that § 2021(b)(3) was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated solely by reserve status. Congress wished to provide protection to reservists comparable to that already protecting the regular veteran from "discharge without cause"— to insure that employers would not penalize or rid themselves of returning reservists after a mere *pro forma* compliance with § 2024(d).

*Monroe v. Standard Oil Co.,* 452 U.S. 549, 559–60, 101 S.Ct. 2510, 2516–17, 69 L.Ed.2d 226 (1981).

■ The motion for summary judgment raises a number of issues. Defendants argue that Novak's failure to return to work or to apply for reinstatement as required by § 2021(a) is a "jurisdictional prerequisite" to the Court hearing a suit brought pursuant to the VRRA. Doc. 37 at 5. This Court is granted jurisdiction over claims brought pursuant to the VRRA by § 2022.[8] The statutory requirement that a veteran "make[ ] application for reemployment within ninety days after such person is relieved from training and service" is found at § 2021(a). Section 2021(a) applies to regular military personnel. Novak is a reservist and therefore § 2021(b)(3)—not § 2021(a)—applies here.[9]

Section 2021(b)(3) does not require application for reemployment.[10]

In addition, by Defendants' own interpretation, § 2021(a) applies to periods of "extended military leave." Doc. 37 at 4. There are two absences due to military obligations at issue here: Novak's six-month's service in Desert Storm and her January 24, 1992, training in Salt Lake City. There is no dispute that Novak was reinstated after returning from Desert Storm, although she does dispute whether she was reinstated for "like seniority, status, and pay." With regard to the January 24th absence, a one-day training session is, by no stretch of the imagination, an "extended military leave."

■ Also with regard to the January 24th training session, Defendants argue that § 2024(d) requires an employee-reservist to return or reapply to work. Defendants cite the Court to that portion of § 2024(d) which reads:

> Such employee shall report for work at the beginning of the next regularly scheduled working period after expiration of the last calendar day necessary to travel from the place of training to the place of employment following such employee's release, or within a reasonable time thereafter if delayed return is due to factors beyond the employee's control.

Doc. 37 at 4. Defendants' failed to cite the next sentence which reads:

> Failure to report for work at such next regularly scheduled working period shall make the employee subject to the conduct rules of the employer pertaining to expla-

---

Mackintosh at 97.

**8.** Section 2022 of the VRRA states, in part:

> If any employer … fails or refuses to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or 2024 of this title, the district court of the United States for any district in which such private employer maintains a place of business … shall have the power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action.

38 U.S.C. § 2022 (1991).

**9.** Section 2021(b)(3) of the VRRA reads:

> Any person who seeks or holds a position described in clause (A) or (B) of subsection (a) of this section shall not be denied hiring, retention in employment, or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces.

38 U.S.C. § 2021(b)(3) (1991).

**10.** The USERRA requires that an employee returning from military training or service notify his or her employer of their intent to return to a position of employment within certain time periods, depending upon the length of the absence, in order to receive protection under the Act. 38 U.S.C. §§ 4312(e)(1) & 4312(h) (Supp.1995).

nations and discipline with respect to absences from scheduled work.

38 U.S.C. § 2024(d). Failure to report to work after a training session does not deprive the Court of jurisdiction, nor is it required in order to state a claim under the VRRA.[11]

■ Defendants similarly argue that Novak gave Dakota Industries inadequate notice of the January 24 training session, thereby giving cause for her dismissal. Defendants cite *Burkart v. Post–Browning, Inc.,* in which an employee gave his employer 15 minutes notice of three-week training session. 859 F.2d 1245, 1246 (6th Cir.1988). The undisputed facts are that the January 24th training session was discussed as a possibility on January 16, and Novak presented her orders to Mackintosh at 4:30 P.M. on Wednesday, January 22. I find that the notice is not *per se* unreasonable. Summary judgment is accordingly denied in that Defendants' have failed to demonstrate any jurisdictional or statutory basis for judgment as a matter of law.

In the alternative, Defendants move to dismiss Donald P. Mackintosh from this suit as an improper party as a matter of law. Doc. 36. Defendants cite Fed.R.Civ.P. 17(a) and argue that South Dakota law applies to determine the real party in interest because Mackintosh is a resident of South Dakota. Defendants then cite several South Dakota cases standing for the proposition that a corporate officer is not liable for contractual obligations of the corporation. Doc. 37 at 6. Plaintiff did not respond on the issue.

■ The VRRA creates a federal cause of action to which federal, rather than state, law applies. *See, i.e.,* 38 U.S.C. § 4302(b) (Supp.1995).[12] Section 2022 of the VRRA provides, "In any such action only the employer shall be deemed a necessary party respondent." This language has been interpreted as preventing the joinder of third parties rather than limiting the parties sued. As one district court explained in determining that a pension fund was an appropriate defendant in addition to the employer:

> However, the fact that the Fund is deemed an unnecessary party to Bunnell's action under § 2022 does not mean that it is an improper or impermissible party to the action. Rather, the "necessary party" language allows the plaintiff the choice of whether to sue anyone other than his immediate employer, such as his union or pension fund. It also deprives the employer of the right to bring in such parties or dismiss the action, although they might otherwise be found to be necessary under Rule 19(a) due to their interest in the result of the suit.

*Bunnell v. New England Teamsters & Trucking Indus. Pension Fund,* 486 F.Supp. 714, 720 (D.Mass.1980), *aff'd,* 655 F.2d 451 (1st Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982).

While the VRRA imposes liability upon an "employer," the Act does not define the term. Although there are cases dealing with whether a party defendant is an employer under the Act, they generally deal with *de facto* employers such as pension funds. *See, i.e., Imel v. Laborers Pension Trust Fund for Northern Cal.,* 904 F.2d 1327 (9th Cir.1990); *Bunnell,* 486 F.Supp. at 714. This Court must determine whether Mackintosh is an employer, and whether he is liable, if the Court so determines at trial, in both his official and individual capacities.

■ Two theories of employer liability have evolved in labor law. The first is that, as courts have interpreted Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and, for the most part, Employee Retirement Income Security Act [ERISA], an employer is not personally liable for violation of those statutes.[13] For

---

11.  *See supra.*

12.  Section 4302(b) of the USERRA provides:
     This chapter supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this

chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit.
38 U.S.C. § 4302(b) (Supp.1995).

13.  The Court notes that one district court looked to areas of labor law such as ERISA, 29 U.S.C. § 1001 *et seq.;* Title VII, 42 U.S.C. § 2000e *et*

example, Title VII suits are properly brought against employers and individuals—in their official capacities but not their individual capacities. *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993) (citing *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991)). *See Lenhardt v. Basic Institute of Technology, Inc.,* 55 F.3d 377, 380 (8th Cir.1995), in which the Eighth Circuit, although it has not directly addressed the question of individual liability under Title VII for employee-supervisors, predicted that Missouri would find the reasoning of those courts which have denied individual liability under Title VII persuasive. *See also Rockney v. Blohorn,* 877 F.2d 637 (8th Cir.1989), in which the Eighth Circuit addressed the issue of personal liability of employers under ERISA, noted the differing purposes of the Fair Labor Standards Act [FLSA] and ERISA, and held that, although FLSA permits suits against employers in their individual capacities, "corporate officers cannot be held personally liable under ERISA where there is no basis for piercing the corporate veil." *Id.* at 643.

▇ The second line of reasoning in labor law imposes personal liability upon employers. The Fair Labor Standards Act is the primary piece of legislation in that regard. The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir.1991) (quoting *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir.1983)).

▇ The Court also looks to the Uniformed Services Employment and Reemployment Rights Act [USERRA] which replaced the VRRA in 1994 for guidance. First, the legislative history of the USERRA indicates that the act was designed to improve, rather than replace the VRRA:

The Veterans' Reemployment Rights (VRR) provisions of Federal law, which safeguard employment and reemployment rights in civilian employment of members of the uniformed services, have been in effect for over fifty years. Although the law has effectively served the interests of veterans, members of the Reserve Components, the Armed Forces and employers, the current statute is complex and sometimes ambiguous, thereby allowing for misinterpretations.... Accordingly, the primary goals of the Committee, in undertaking the revision of chapter 43, were to clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions....

Moreover, new section 4303 would define significant terms used throughout the Act in an effort to avoid misinterpretation of those terms....

The provisions of Federal law providing members of the uniformed services with employment and reemployment rights, protection against employment-related discrimination, and the protection of certain other rights and benefits, have been eminently successful for over fifty years. Therefore, the Committee wishes to stress that the extensive body of case law that has evolved over that period, to the extent that it is consistent with the provisions of this Act, remains in full force and effect in interpreting these provisions. This is particularly true of the basic principle established by the Supreme Court that the Act is to be "liberally construed."

H.Rep. No. 103–65, 103d Cong., 2d Sess. 21 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2451–52 [hereinafter "House Report"]. Second, although not making the same reference for the term "employer," the legislative history of the USERRA states:

Section 4303(3) would define "employee" in the same expansive manner as under the

*seq.;* and the National Labor Relations Act, 29 U.S.C. § 151 *et seq.,* for guidance in defining "employer." *Bunnell v. New England Teamsters & Trucking Indus. Pension Fund,* 486 F.Supp. 714, 721 (D.Mass.1980), *aff'd,* 655 F.2d 451 (1st Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct.

1253, 71 L.Ed.2d 446 (1982). In *Bunnell,* however, the court was deciding whether a pension fund was an employer for purposes of VRRA. I find the case of little help on the official versus individual liability issue.

Fair Labor Standards Act, 29 U.S.C. 203(e)....

House Report at 2454. Third, the USERRA broadly defines "employer":

[T]he term "employer" means any person, institution, organization, or other entity that pays salary or wages for work performed or that has control over employment opportunities[.]

38 U.S.C. § 4304(4) (Supp.1995). Fourth, the definition of "employer" found in the Uniformed Services Employment and Reemployment Rights Act is closer to the definition of employer found in the Fair Labor Standards Act than that in Title VII of the Civil Rights Act of 1964.[14] Therefore, the Court finds that the Veterans Reemployment Rights Act, like the Fair Labor Standards Act, imposes joint and several liability upon employers as both individuals and entities.

■ Defendant Mackintosh testified in his deposition that he is the President of Dakota Industries as well as a member of the Board of Directors. Mackintosh at 9, 13–14. Novak reported directly to Mackintosh. *Id.* at 117–18. The Court finds that Mackintosh qualifies as an "employer" under the VRRA. Summary judgment is therefore denied with respect to Defendant Mackintosh being an appropriate party in this matter.

Although this case falls under the VRRA because reemployment was initiated prior to October, 1994, *see supra* n. 1, the standard of proof under the VRRA is continued under the USERRA. Section 4311(b) of the USERRA provides:

An employer shall be considered to have denied a person initial employment, reemployment, retention in employment, promotion, or a benefit of employment in violation of this section if the person's membership, ... service, ... or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove

that the action would have been taken in the absence of such membership, ... performance of service ... or obligation.

38 U.S.C. § 4311(b) (Supp.1995). As the legislative history to § 4311(b) indicates:

This standard and burden of proof is applicable to all causes brought under this section regardless of the date of accrual of the cause of action. To the extent that courts have relied on dicta from the Supreme Court's decision in *Monroe v. Standard Oil Co.*, 452 U.S. 549, 559 [101 S.Ct. 2510, 2516, 69 L.Ed.2d 226] (1981), that a violation of this section can occur only if the military obligation is the sole factor *see Sawyer v. Swift & Co.*, 836 F.2d 1257, 1261 (10th Cir.1988), those decisions have misinterpreted the original legislative intent and history of 38 U.S.C. 2021(b)(3) and are rejected on that basis.

House Report at 2457.

■ Accordingly, this VRRA claim requires the same type of analysis as employment discrimination or retaliatory discharge claims under Title VII. In those claims, the Eighth Circuit applies the three-part, "burden shifting" analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

First, the plaintiff must. make a *prima facie* case by "showing participation in a protected activity, a subsequent adverse action by the employer, and some evidence of a causal connection between the protected activity ... and the subsequent adverse action." Second, once the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate an appropriate nondiscriminatory reason for its action. Finally, if the employer satisfies this burden, the plaintiff must then demonstrate that the proffered reason is pretextual.

*Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 365 (8th Cir.1994) (citing *Schweiss v. Chrysler*

---

**14.** The FLSA states:

"Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee....

29 U.S.C. § 203(d) (1978). In contrast, Title VII of the 1964 Civil Rights Act defines "employer" as:

[A] person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, and any agent of such a person....

42 U.S.C. § 2000e(b) (1994).

*Motors Corp.*, 987 F.2d 548, 549 (8th Cir. 1993)). "However, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir.1995) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989) (plurality opinion)). *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 780 (8th Cir. 1995) (holding the *Price Waterhouse* mixed-motives analysis did not apply in Title VII case where plaintiff had not made a preliminary showing of discrimination or established a causal relationship between discriminatory "attitude" and adverse employment actions). *See also Hansen v. Town of Irondequoit*, 896 F.Supp. 110, 113 (W.D.N.Y.1995) (setting out "burden shifting" analysis as it applies to the VRRA).

■ In this case, Novak has demonstrated that she was a member of the Army Reserves, that she was dismissed from her employment, and that her employer threatened to fire her if she was not at work on January 24, the day she was to train in Salt Lake City. Defendants alleged facts claiming that Novak was fired for cause, including job abandonment and insubordination. Mackintosh at Ex. 9. "[T]he conflict between the plaintiff's evidence establishing a *prima facie* case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial." *Cronin*, 46 F.3d at 203; *Davis v. Fleming Companies, Inc.*, 55 F.3d 1369, 1371 (8th Cir.1995) (recognizing the sparing use of summary judgment to determine discriminatory or retaliatory intent in employment cases). Accordingly,

IT IS ORDERED:

(1) That Plaintiff's Motion to File Supplemental Brief, Doc. 52, is granted and the brief has been considered by the Court in its analysis of the Motion for Summary Judgment,

(2) That Defendants' Motion for Summary Judgment is denied in all respects.