**Rita J. NOVAK, Plaintiff,**

v.

**Donald P. MACKINTOSH and Dakota Industries, Inc., Defendants.**

**No. CIV 95–4051.**

United States District Court, D. South Dakota, Southern Division.

July 17, 1996.

---

Bonnie P. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, for plaintiff.

James A. Hertz, Christopherson, Bailin & Anderson, Sioux Falls, SD, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PIERSOL, District Judge.

This matter was tried to the Court without a jury on February 14, 1996; February 29, 1996; and April 19, 1996. Plaintiff, Rita Novak, brought suit against Donald P. Mackintosh and Dakota Industries, Inc., for violations of the Veterans' Reemployment Rights Act ["VRRA"], 38 U.S.C. §§ 2021 *et seq.*, seeking back pay, benefits, and prejudgment interest. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the Court enters its findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff, Rita Novak ["Novak"], is a Supply Sergeant with the 323rd Chemical Company based in Sioux Falls, South Dakota. Novak joined the Army Reserve in September of 1981. She was hired by Defendant Dakota Industries, Inc., on March 28, 1989. Novak informed Dakota Industries that she was in the Army Reserve on her job application. Plaintiff's Ex. 11. On November 17, 1990, Novak was ordered to active duty "in support of Desert Shield." Plaintiff's Ex. 6. She was released from active duty on May 14, 1991, and returned to work at Dakota Industries on June 3, 1991. Her last day at Dakota Industries was January 23, 1992.

2. Defendant Donald P. Mackintosh is the President of Dakota Industries. He was a management consultant for the 26 years prior his association with Dakota Industries, and Dakota Industries does not pay his salary. Mackintosh describes Defendant Dakota Industries as "a little bankrupt sewing com-

pany." During the time in question, Dakota Industries employed between seven (7) and twelve (12) people. Plaintiff's Ex. 20. Dakota Industries has sewn a line of outdoor wear under its own label, but generally does contract sewing for other companies. Under Mackintosh, the company successfully completed a Chapter 11 reorganization.

3. Due to her military obligations, but not counting her time on active duty for Desert Storm, Novak missed a total of 36 days of work during the approximately three years that she was employed by Dakota Industries.[1] Plaintiff's Ex. 10. Also excluded from that number is the one weekend a month reserve training which did not affect her time at work. Id. Between her return from Desert Storm on June 3, 1991, and her termination on January 24, 1992, Novak missed two and one-half days as a result of the shipping dock incident,[2] two Fridays for active duty training, and one other Friday.[3] Defendants' Ex. F.

4. Novak was hired by Dakota Industries to work in the front office at a rate of $4.00 per hour. Plaintiff's Ex. 5 at 9. In the ensuing three years, she was promoted to Office Manager, Personnel Manager, and then Production Control Manager, with corresponding raises to $6.50 per hour. Id. at 4–7. On November 12, 1990, just before she left for Desert Storm, Novak was promoted to General Manager, and given a $0.50 raise to $7.00 per hour. Id. at 3. Novak, who did the payroll as part of her regular duties before Desert Storm, paid herself at the $7.00 rate one week prior to leaving for Desert Storm. Mackintosh testified that he told her "not to fall in love with the raise"— that it was for her future employability in the event that Dakota Industries was no longer in business when she returned from Desert Storm. When she returned from Desert Storm, she was paid at the $6.50 rate. Plaintiff's Ex. 10.

5. The Payroll Journal for Dakota Industries indicates that while Novak was participating in Desert Storm, management employees received two $0.50 per hour raises: one in February of 1991 which is reflected on the report for February 22, 1991, and one in May of 1991, reflected on the report for May 10, 1991. Plaintiff's Ex. 20. Although Novak testified that the February raise was an across-the-board raise to management employees, and the Payroll Journal indicates that four employees[4] received raises, the Change of Status reports for Heidimarie Murray indicate that she was promoted from Line Operator to Sample Shop Supervisor, with a corresponding $0.50 per hour raise on February 18, 1991. Plaintiff's Ex. 22. The same Change of Status reports indicate that

1. Novak was gone for 112 days in relation to Desert Storm. Plaintiff's Exhibits 6 & 10. Her other military obligations were (1) two weeks active duty training in Bismark, North Dakota (June 3 through 17, 1989); (2) three days active duty training for LRO and Area Supply School in Salt Lake City, Utah (March 16, 1990); (3) two weeks active duty training in Rapid City, South Dakota (June 9 through 16, 1990); (4) 180 days activity duty in support of Operation Desert Shield (November 17, 1990 through May 14, 1991); (5) two days active duty training for Metl Development First Line Leader School in Sioux Falls, South Dakota (September 7 through 9, 1991); (6) ten days of Active Duty Special Work for Desert Stork Demobilization Support in Sioux Falls, South Dakota (September 9 through 21, 1992); and, (7) three days active duty training for 1992 DSCLOG School in Salt Lake City (January 24, 1992). Plaintiff's Ex. 6.

2. The "shipping dock incident" arose from Mackintosh's insistence that all deliveries be received at the receiving dock at the back of the plant which had a door that was very difficult to open. Novak periodically received deliveries at the shipping dock—the door was easier for one person to handle, and trucks preferred unloading there because it was easier to back up to. Mackintosh testified he had warned Novak not to receive shipments at the shipping dock on two occasions before the shipping dock incident. On August 7, 1991, Novak accepted a shipment at the shipping dock and Mackintosh told her to "punch out." She did not return to work for two days, the time it took her to "cool off."

3. Mackintosh testified he noted Novak's absenteeism on Fridays because she was never present to help with the UPS deliveries about 3:30 P.M. He further testified, and Novak's time cards reveal, that she was working the 6:00 A.M. to 2:30 P.M. shift from June until mid-August, 1991. Defendants' Ex. F. After the shipping dock incident, Mackintosh changed Novak's hours, and she worked from 8:00 A.M. until 4:30 P.M.

4. The employees who received raises in February, 1991, were Heidimarie Murray, Bonnie Silvernail, Laurie Mortenson, and Marian Halverson. Plaintiff's Ex. 20.

Heidimarie received a merit increase of $0.50 per hour, with no change in job description on May 3, 1991. *Id.* The payroll register for May 10, 1991, confirms that Heidimarie and four other employees received raises of $0.50 per hour.[5]

6. At the time she left for Desert Storm, and at a salary of $6.50, Novak was the highest paid employee in the plant. Novak testified she ran the day-to-day operation of the plant while Mackintosh devoted his time to some nine lawsuits involving trademark infringement. Novak was left in charge of Dakota Industries for a month while Mackintosh went to Egypt. Prior to her departure for Desert Storm, her duties included payroll, and preparing attendance reports, management reports and 5-day plans. When she returned, she no longer had accounting duties, and therefore was not able to complete the management reports. Novak was usually the last person out of the plant at night, and the one to lock up.

7. It was policy at Dakota Industries that employees receive calls only on the pay telephone during break. Sergeant Richard Mohr, a full-time reservist, was in charge of the actual orders for the 323rd Chemical Company's mobilization in Desert Storm. He testified that Mackintosh routinely gave him resistance when he attempted to contact Novak at Dakota Industries, telling him to call only when necessary. Mohr testified he called Novak no more than once a week, and usually talked for no more than five minutes. He further testified that of 500 reservists in Sioux Falls, Dakota Industries was the only employer with whom there was any problem.

8. Dakota Industries has a progressive discipline policy stated in its *Absenteeism and Tardiness Disciplinary Action Policy,* Plaintiff's Ex. 1. The policy states that an employee will receive points for various absences, including one (1) point for absence due to illness or injury, one (1) point for absence due to personal business, and four (4) points for each day missed dues to unauthorized absences. *Id.* An employee who accumulates six (6) points is to be given an oral warning; nine (9) points warrants a written warning; 10 points results in a one day lay-off; 12 points warrants a final warning; and an employee who accumulates 15 points is discharged. *Id.* Novak never received any kind of a written warning concerning her allegedly unsatisfactory job performance. Prior to Desert Storm three attendance reports were placed in Novak's personnel file showing she had received only three points for absences due to weather or illness. Novak's employment file contained no attendance reports for the time after her return from Desert Storm. Had attendance reports been filed after Desert Storm, Novak would have accumulated 15 points, primarily due to tardies and early departures.

9. The relationship between Mackintosh and Novak became increasingly strained after Novak's return from Desert Storm. Novak and Mackintosh both testified that she had changed as a result of the experience. One point of contention was that Novak occasionally received shipments at the shipping dock.[6] Another point of contention was Mackintosh's insistence that she not order "short cuts," [7] or begin runs when all of the required inventory was not yet in stock.[8] Mackintosh was also concerned about the

---

5. Those employees receiving a raise on May 10, 1991, were three supervisory employees: Heidimarie Murray, Bonnie Silvernail, Marian Halverson. Two other, long-time employees also received raises at that time. Laurie Mortenson no longer worked at Dakota Industries, as of April 13, 1991. Plaintiff's Ex. 20.

6. *See supra* n. 2.

7. During the 18–24 months prior to Novak's departure, a small company named Great Threads was Dakota Industries only customer. Great Threads had contracted for a 5000–unit price, and Mackintosh testified he would rather shut down the plant than run short orders. Nevertheless, Novak testified she ordered short runs in order to keep the employees working. Mackintosh would grumble, but never told her not to order the short runs. Mackintosh testified that Dakota Industries would do short runs, but they were more expensive because the set-up time remained the same regardless of how many units were sewn.

8. Great Threads was apparently having financial difficulties and some suppliers would not ship findings (zippers, fasteners, etc.) to Dakota Industries if Great Threads was to pay for them.

growing friendship between Novak and Debbie Blallock, the president of Great Threads. Finally, Novak challenged the fact that she was not receiving the raise given just prior to her departure for Desert Storm, and Mackintosh told her she knew she was not entitled to it.

10. From January 9 through January 15, 1992, Novak and co-employee Heidimarie Murray attended a trade show in Denver, Colorado.[9] Debbie Blallock invited Novak to go, Novak asked for time off to attend the trade show, and she originally planned to take her husband along. Mackintosh decided to send Novak as a representative of the company, had business cards printed for Novak identifying her as "Production Control" and "Purchasing Agent" for Dakota Industries, and gave her $500.00 for expenses.[10] Heidimarie accompanied Novak to the trade show without pay, and shared a hotel room with Novak. Mackintosh gave Heidimarie $150.00 as spending money. Great Threads paid for Novak's hotel room, some meals and some drinks during the show.

11. Mackintosh's purpose for sending Novak to Denver was to inform Great Threads that Dakota Industries was raising the prices for the quantities Great Threads wanted sewn. Heidimarie testified that Novak did not fully support Mackintosh's new prices in her meetings with Great Threads, telling Great Threads that some of the prices charged were way too high. Although no alcohol was consumed during the meetings, Heidimarie testified that Novak made a spectacle of herself because of her drinking after hours while attending the trade show. In fact, during the show, Novak became intoxicated and vomited, losing her lower set of false teeth, and flushing them down the toilet.

12. Upon her return from Denver, Novak scheduled a dental appointment in Sioux City on Thursday, January 23, to replace her false teeth. Replacement of the teeth was an all day affair: molding at 8:00 A.M., fitting at 1:00 P.M., with the finished product ready to be picked up at 4:00 P.M. Novak informed Mackintosh of the dental appointment on January 16, 1992. The testimony about the dental appointment is conflicting: Mackintosh testified that he told her she could not keep the dental appointment and would have to get her teeth fixed outside business hours; Novak testified Mackintosh never told her she could not go to the dentist. And, Heidimarie testified Mackintosh teased Novak about her missing teeth in the lunchroom in front of other employees.

13. On January 16, during the conversation about the dental appointment, Novak also informed Mackintosh that there was a good possibility that she would be gone on Friday, January 24, for active duty training in Salt Lake City. Mackintosh replied that, if she went, he would have to advertise her position.[11]

14. Novak's written orders[12] for Salt Lake City were on the receptionist's desk at Dakota Industries the morning of Wednesday, January 22. Mackintosh and Novak did not talk until the end of the day on January 22, when Mackintosh asked if she was going to obey the orders for Salt Lake City as she was leaving. When Novak informed him she was going to obey the orders, Mackintosh told her to leave her keys on the desk. Novak kept her dental appointment and did not go to work at Dakota Industries on Thursday. She also went to her training in Salt Lake on Friday. In Saturday's mail she received a paycheck dated January 24, 1992, signed by Mackintosh, with "This represents final and total payment for all amounts due

9. The Plaintiff was to return from Denver on January 14, but was snowed in. She returned home January 15, and was at work on January 16, 1992.

10. Novak saved her gas receipts, but Mackintosh never asked for an accounting of the $500.00 he gave Novak or the $150.00 he gave Heidimarie.

11. Heidimarie testified she overheard Mackintosh tell Novak, "If you are going to the Army thing, you are done." She never heard Mackin-

tosh tell Novak she could or could not go to the dentist, and, in fact, never heard the word "dentist."

12. The orders for Salt Lake City were cut on January 9, 1992, at Fort Douglas, Utah, and received in Sioux Falls on January 13, 1992. Novak returned from Denver the evening of January 15, and did not have the written orders in hand until January 21.

from Dakota Industries, Inc." stamped on the back. Plaintiff's Ex. 3. On Monday, January 27, Mackintosh promoted Bonnie Silvernail into Novak's position as P/C Manager. Plaintiff's Ex. 23. Novak believed she had been fired and never returned to Dakota Industries.

15. Sometime in January of 1992, Mackintosh called the Department of Military Affairs in Pierre, South Dakota, and spoke with Larry Person who supervises the field staff. Person testified he spoke with Mackintosh more than once, and perhaps as many as six times. Mackintosh wanted to know what his rights as an employer were. Person referred him to the Department of Labor, and arranged for a packet of information concerning employer rights to be sent to Mackintosh.

16. On Wednesday, January 22, 1992, Mackintosh called Novak's commanding officer, Captain Mark Snoozy asking if orders had been published for Novak's training in Salt Lake City. During the course of an increasingly hostile conversation, Mackintosh indicated to Capt. Snoozy that he would fire Novak if she did not show up for work on Friday, January 24.

17. On February 11, 1992, Novak filed a complaint with the United States Department of Labor, Veterans' Employment and Training Service [VETS]. The State Director held a fact finding meeting with Mackintosh, and, due to the lack of anything in Novak's personnel file indicating she was an employee who performed poorly, issued a letter of merit.[13] The case was transferred to the Regional office in Denver, Colorado, on July 1, 1992. Defendants heard nothing further until October 18, 1994, when the Department of Labor informed them the Department of Justice was bringing suit. Defendants' Ex. J. The instant suit was filed on March 14, 1995. Doc. 1.

18. Novak received unemployment insurance in the amount of $154.00 per week until May 9, 1992. On May 9, Novak became employed as a full-time civilian employee of the Army Reserve.

19. Mackintosh's stated reasons for terminating Rita Novak have changed over time. Novak's Change of Status form from her personnel file states she was discharged for "Job abandonment, insubordination, violating co. rules & disloyalty to company." Plaintiff's Ex. 5 at 1. When Novak filed with the State of South Dakota for unemployment benefits, Mackintosh resisted stating she had been terminated for "Job Abandonment coupled with repeated insubordination & violation of Company policies." Plaintiff's Ex. 18. When the award of unemployment insurance was appealed, Mackintosh alleged breach of company security and dishonesty. Plaintiff's Ex. 19. When Mackintosh contested the VETS finding of merit, he alleged Novak had been terminated for her failure to give timely notice of her training on January 24, 1992, and that her position had been eliminated as part of a reduction in force at Dakota Industries. Plaintiff's Ex. 29 & 30.

## CONCLUSIONS OF LAW

1. Plaintiff brings this action under the Veterans Reemployment Rights Act [VRRA], codified at 38 U.S.C. §§ 2021–27, as amended.[14] Defendants argue this action is barred under the equitable doctrine of laches. The VRRA specifically states, "No State statute of limitations shall apply to any proceedings under this chapter." 38 U.S.C. § 2022. Because the Act provides an equitable remedy, the doctrine of laches may be applied to determine whether the filing of the claim was timely. As the Eighth Circuit notes:

> Laches may be used to bar a lawsuit when the plaintiff is guilty of (1) unreasonable and unexcused delay, (2) resulting in prejudice to the defendant.... In this circuit, laches may apply either when the delay in bringing suit was caused by a private

---

13. The Director testified that he had talked with Mackintosh about the raise to $7.00, and Mackintosh told him he had told Novak "not to be in love with that raise." The Change of Status report reflecting the raise was, nevertheless, in the personnel file when the director examined it.

14. For a summary of the amendments to the VRRA, and the resulting renumbering of its provisions, see this Court's Order dated January 30, 1996, Doc. 58 n. 1 (published at 919 F.Supp. 870, 872 n. 1).

plaintiff or when the delay is the fault of an administrative agency.

*Whitfield v. Anheuser–Busch, Inc.,* 820 F.2d 243, 244–45 (8th Cir.1987) (citing *Goodman v. McDonnell Douglas Corp.,* 606 F.2d 800, 804 (8th Cir.1979), *cert. denied,* 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980)). Defendants bear the burden of proving the affirmative defense. *Goodman,* 606 F.2d at 806.

2. Defendants argue that the delay from July 1, 1992, until October 18, 1994, which is the time this case was pending before the Department of Labor, bars Novak's claim. Although the time required for government action is attributable to Novak, and although the Court finds 27 months to be excessive for evaluation of this claim, the Court finds no significant prejudice to Defendants. Defendants did not allege evidence was lost or witnesses were unavailable as a result of the delay, and the persons who testified had good recollections of significant facts. *Goodman,* 606 F.2d at 808 n. 17. Although the delay is inconvenient, Defendants presented no evidence that they changed their position in any way that would not have occurred if the Department of Labor had not delayed. *Id.* (citing *Tobacco Workers Int'l Union Local 317 v. Lorillard Corp.,* 448 F.2d 949, 958 (4th Cir.1971)). There being no prejudice to Defendant, the claim is not barred.

3. Novak's first claim under the VRRA is that, upon her return from Desert Storm, she was not restored to the pay and status she would have enjoyed without the interruption for military service in violation of 38 U.S.C. §§ 2024(b) and 2021(b)(2). Section 2024(b) makes those reemployment and benefit rights available to regular active duty military personnel applicable to reservists. Section 2021(b)(2) requires military personnel "be so restored or reemployed in such manner as to give such person such status in the person's employment as the person would have enjoyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment." 38 U.S.C. § 2021(b)(2).

4. In *Alabama Power Co. v. Davis,* the Supreme Court stated a two-pronged test to determine whether a benefit is secured to returning military personnel by the Act:

> If a benefit would have accrued, with reasonable certainty, had the veteran been continuously employed by the private employer, and if it is in the nature of a reward for length of service, it is a "perquisite of seniority." If, on the other hand, the veteran's right to the benefit at the time he entered the military was subject to a significant contingency, or if the benefit is in the nature of short-term compensation for services rendered, it is not an aspect of seniority within the coverage of Section 9.

431 U.S. 581, 589, 97 S.Ct. 2002, 2007, 52 L.Ed.2d 595 (1977); *Coffy v. Republic Steel Corp.,* 447 U.S. 191, 197–98, 100 S.Ct. 2100, 2105, 65 L.Ed.2d 53 (1980); *Goggin v. Lincoln St. Louis,* 702 F.2d 698, 701 (8th Cir. 1983).

5. When she left for Desert Storm with the 323rd Chemical Company, Rita Novak was employed by Dakota Industries at a rate of $6.50 per hour in her job as office and personnel manager. Immediately before she was to report for active duty, Donald P. Mackintosh, President of Dakota Industries, promoted Novak to "general manager" and gave her a raise to $7.00 per hour. Primarily because of the company's poor financial history, testimony that the raise and promotion were given as a type of insurance policy to help Novak obtain a new position should the company be out of business by the time she returned was credible. The position of general manager and the accompanying raise were contingent upon Dakota Industries going out of business while Novak was on active duty, thereby meeting the second prong of *Alabama Power.* Novak, therefore, was not entitled to reemployment at a rate of $7.00 per hour based on the "promotion" received before leaving for Desert Storm.

6. Military personnel who return from active duty are entitled to the seniority and salary increases they would have been entitled to had they been continuously employed. 38 U.S.C. § 2021(b)(2). This "escalator principle" requires that Novak be given

any raises she would have received while at Dakota Industries, regardless of her position or abilities, during her absence for Desert Storm. *Goggin,* 702 F.2d at 701. There were two raises given to employees of Dakota Industries during Desert Storm. There is no evidence to demonstrate the February raise was given primarily for length of service; in fact, the evidence from Heidimarie's Change of Status reports is to the contrary. However, the May raise was given to Heidimarie with no change in position or job description. And, Mackintosh testified that the non-office personnel who received raises were long-time employees. Under the test articulated in *Alabama Power* and *Goggin,* Novak would have received a $0.50 per hour raise in May of 1991 had she been at Dakota Industries, and she should have been reinstated at a rate of $7.00 per hour. Novak is therefore entitled to the difference in pay between the rate she should have received and that actually received upon her return from Desert Storm.

■ 7. Novak's second claim is that she was terminated within one year of reemployment as a result of her military obligation in violation of 38 U.S.C. §§ 2024(b) and 2021(b)1)(A). In its Order dated January 30, 1996, Doc. 58, the Court set out the standard applicable to be applied on this issue. *See Novak v. Mackintosh,* 919 F.Supp. 870, 878–79 (D.S.D.1996). As the Court noted, the standard of proof under the VRRA is the same as under the Uniformed Services Employment and Reemployment Rights Act [USERRA], codified at 38 U.S.C. §§ 4301–33, effective October 13, 1994. Section 4311(b) of the USERRA provides:

An employer shall be considered to have denied a person initial employment, reemployment, retention in employment, promotion, or a benefit of employment in violation of this section if the person's membership, ... service, ... or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, ... performance of service ... or obligation.

38 U.S.C. § 4311(b) (Supp.1995). The Court also held a VRRA claim requires the same type of burden-shifting analysis from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) that the Eighth Circuit applies in employment discrimination or retaliatory discharge claims under Title VII. The Eighth Circuit has explained:

First, the plaintiff must make a *prima facie* case by "showing participation in a protected activity, a subsequent adverse action by the employer, and some evidence of a causal connection between the protected activity ... and the subsequent adverse action." Second, once the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate an appropriate non-discriminatory reason for its action. Finally, if the employer satisfies this burden, the plaintiff must then demonstrate that the proffered reason is pretextual.

*Reich v. Hoy Shoe Co., Inc.,* 32 F.3d 361, 365 (8th Cir.1994) (citing *Schweiss v. Chrysler Motors Corp.,* 987 F.2d 548, 549 (8th Cir. 1993)). "However, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 247, 109 S.Ct. 1775, 1788, 104 L.Ed.2d 268 (1989) (plurality opinion)). *See Hansen v. Town of Irondequoit,* 896 F.Supp. 110, 113 (W.D.N.Y. 1995) (setting out "burden shifting" analysis as it applies to the VRRA). The Court is also mindful that the VRRA is to be liberally construed. *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946); H.Rep. No. 103–65, 103d Cong., 2d Sess. 21 (1993), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2451–52 (referencing USERRA).

■ 8. The Court finds Novak has established a *prima facie* case: it was clearly established at trial she is a member of the Army reserve; she was terminated from her employment with Dakota Industries as evi-

denced by the "final" check and the demand she turn in her keys; and there is a causal connection between the two as evidenced by testimony from Novak's commanding officer, Heidimarie Murray, and Novak herself that Mackintosh threatened to fire her if she attended the January 24 training session.

9. Defendants have articulated "an appropriate non-discriminatory reason" for their actions in terminating Novak. In fact, Defendants have articulated some six or seven reasons for termination, beginning with "Job abandonment, insubordination, violating co. rules & disloyalty to company" and ending with failure to give adequate notice, breach of security, dishonesty, and a reduction in force. This "shifting sands" defense is some evidence of pretext. *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir.1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."). The Court will consider only those reasons offered at the time of termination.

10. The Court concludes that Novak's military obligation was a motivating factor in her termination. Sgt. Mohr's testimony showed Mackintosh was not fully supportive of Novak's military obligation before she left for Desert Storm. Evidence at trial demonstrated the friction between Novak and Mackintosh escalated over time, and may have resulted from a number of factors: Novak's experiences in Desert Storm and a growing discontent when she returned, the company's relationship with customer Great Threads, differences in opinion regarding company policies, the stories Mackintosh heard about the trade show in Denver, and Novak's military obligation. The phone calls Mackintosh made to the South Dakota Office of Veterans' Affairs and to Novak's commanding officer threatening to fire her clearly demonstrate that he did not like the fact she was to attend the training session in Salt Lake City.[15] It is undisputed that Mackintosh directed Novak to turn in her keys if she was going to obey her orders for January 24.[16] Novak's military obligation was clearly

---

15. Mackintosh testified he adopted a "wait-and-see" attitude when Novak did not appear for work on January 23 and 24. He also testified he probably would not have terminated Novak had she shown up for work on Thursday, and he probably would have permitted her to attend the training session in Salt Lake City. The fact that Mackintosh signed Novak's "final" check on January 24, and promoted Bonnie Silvernail to office manager the following Monday, contradicts this testimony.

16. Defendants argued during trial that Novak's presentation of her orders on Wednesday, January 22, 1992, was unreasonable notice of the leave request. The Court examines the notice issue under the reasonableness standard articulated in *Gulf States Paper Corp. v. Ingram*, 811 F.2d 1464 (11th Cir.1987). In *Gulf States*, the Eleventh Circuit restated the reasonableness test used by the Fifth Circuit in *Lee v. City of Pensacola*, 634 F.2d 886 (5th Cir.1981). *Gulf States* begins with the presumption that the reservist's request for leave is reasonable. *Id.* at 1469. Only three factors are considered in examining the leave request: the length of the leave, the reservist's actions in requesting leave, and the burden upon the employer in filling the reservist's position. *Id.* In the absence of "conduct akin to bad faith" on the part of the employee, the reasonableness test is likely to be satisfied. *Id.* The two other circuits utilizing the reasonableness test have adopted what amounts to a totality of the circumstances test and "have not made clear wither reasonableness should be pre-

sumed or whether the reservist has the burden of establishing it." *Eidukonis v. Southeastern Penn. Transportation Auth.*, 873 F.2d 688, 698 (3d Cir. 1989) (Becker, J., dissenting). *See Eidukonis*, 873 F.2d at 688; *Lee*, 634 F.2d at 886. In the absence of guidance from the Eighth Circuit on this issue, I find the presumption of reasonableness from *Gulf States* to be more in keeping with Congress's comprehensive protection of reserve military personnel through the VRRA and, more recently, USERRA.

Novak's active duty training session in Salt Lake City required her to miss one day of work. Mackintosh testified he had done Novak's work during Desert Storm. An absence of one day, and the resulting minor inconvenience to Dakota Industries do not overcome the presumption of reasonableness. Novak officially notified Mackintosh that she would be absent Friday, January 24, on Wednesday morning, January 22. She gave him a "heads up" on January 16, one week earlier. Although Mackintosh argues Novak was required to notify him as soon as her orders were cut on January 9th and received in Sioux Falls on January 13, Novak did not know the orders had been cut until January 16, after her return from Denver. The reserve office is open for business the same hours that Novak worked at Dakota Industries. Novak could not give notice before she had her written orders in hand, and the Court finds that two days "official" notice for a one-day absence, when the employer knew the orders would be coming, is not unreasonable.

a motivating factor in Mackintosh's decision to terminate her employment. Accordingly, the Court finds the VRRA has been violated, and holds Mackintosh and Dakota Industries are jointly and severally liable for the resulting damages. *See Novak,* 919 F.Supp. at 878.

## DAMAGES

1. Section 2022 provides:

If any employer ... fails to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or 2024 of this title, the district court of the United States ... shall have the power, upon the filing of a[n] ... appropriate pleading by the person entitled to the benefits of such provisions ... to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action.

38 U.S.C. § 2022. Damages under the VRRA are calculated as back wages and other benefits which the veteran would have received had she been reemployed, less actual earnings received from other employers during the same period. *Chaltry v. Ollie's Idea, Inc.,* 546 F.Supp. 44, 51 (W.D.Mich. 1982). Overtime pay and vacation pay are also awardable. *Chernoff v. Pandick Press, Inc.,* 440 F.Supp. 822, 824, 825 (S.D.N.Y. 1977). The issue of sick pay was not raised in this case.

2. Also at issue is whether unemployment benefits must be deducted from damage awards in VRRA discrimination cases. The District Court in New York held that unemployment benefits awarded to the veteran should be deducted from damages awarded because in New York State, unemployment is funded "wholly or in major part by employer contributions." *Chernoff,* 440 F.Supp. at 826. However, the Eighth Circuit recently emphasized the deterrent effect of a backpay award and held that, regardless of the funding mechanism for unemployment benefits, unemployment benefits should not be deducted from an award of back pay in an ADEA case. *Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104 (8th Cir.1994). Because of Congress' intent that the VRRA be interpreted liberally, and the inherent similarities in employment discrimination cases, the Court will follow *Gaworski,* and the unemployment benefits Novak received between January 24, 1992 and May 9, 1992, will not be deducted from her damage award.

3. Between June 3, 1991, and January 24, 1992, Novak worked 1090 regular hours, and 5 overtime hours. The rate of compensation is $0.50, the difference between the rate of $6.50 at which she was compensated and the $7.00 per hour wage to which she was entitled. Novak was paid time and a half for overtime—that rate is $0.75. She is also entitled to 70 hours of vacation pay and 40 hours of holiday pay at the $0.50 rate.

4. Novak is also entitled to lost wages and other benefits for the period January 24, 1992, until May 9, 1992, the time she was reemployed, less any income earned during that period. Novak will be compensated for fifteen, forty-hour weeks at the proven rate of $7.00. Novak failed to demonstrate that she regularly worked overtime after she returned from Desert Storm. Plaintiff's Ex. 14; Defendants' Ex. F. She is also entitled to compensation for health insurance, and Dakota Industries paid one-half of the appropriate rate for each employee. At the time in question, Dakota Industries paid one-half of $78.71 per month, resulting in $9.84 for each of fifteen weeks. Plaintiff's Ex. 15. Novak earned no income she would not normally have earned had she been employed at Dakota Industries during the time in question. Novak is also entitled to receive the amount of her final check, $96.13, which was never cashed. Plaintiff's Ex. 3.

5. Finally, in the effort to make the returning veteran whole, the Court awards prejudgment interest. *Dyer v. Hinky Dinky, Inc.,* 710 F.2d 1348, 1352 (8th Cir. 1983); *Hembree v. Georgia Power Co.,* 637 F.2d 423, 430 (5th Cir.1981). The Eighth Circuit calculates both prejudgment and postjudgment interest at the rate specified in 28 U.S.C. § 1961. *Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1331 (8th Cir.1995) (citing *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1219 (8th Cir.1981)). Prejudgment interest is awarded at the rate equal to the coupon issue yield equivalent of the average accepted auction price for the

last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment, and is awarded on the full amount of Novak's lost wages and benefits, beginning on March 19, 1992, the midpoint of Novak's unemployment. *Thomas v. City & Borough of Juneau,* 638 F.Supp. 303, 307 (D.Alaska 1986).

Judgment will be entered when Plaintiff submits a proposed judgment and proof of the appropriate interest rate to the Court.